USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA,          :      99 Cv. 9940 (LAP)
                                   :
                  Plaintiff,       :
                                   :
          -against-                :         OPINION
                                   :       and ORDER
PORTRAIT OF WALLY, A PAINTING BY   :
EGON SCHIELE,                      :
                                   :       MAILED TO COUNSEL
               Defendant In Rem.   :
------------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

     This protracted dispute stems from the alleged theft
of Portrait of Wally ("Wally" or "the Painting"), a
painting by renowned Austrian artist Egon Schiele, from Lea
Bondi Jaray ("Bondi").  The Government, and Bondi's Estate
(the "Estate"), contend that after the Germans occupied
Austria in 1938, Friedrich Welz, a Nazi, stole Wally from
Bondi, a Jewish owner of a Viennese art gallery, and the
Painting has remained stolen property ever since.  The
Government and the Estate further assert that claimant the
Leopold Museum (the "Museum"), knowing Wally was stolen or
converted, nonetheless shipped it into this country in
violation of the National Stolen Property Act ("NSPA"), 18
U.S.C. § 2314 (1994), thereby rendering the Painting
subject to civil forfeiture pursuant to 18 U.S.C. § 545, 19
U.S.C. § 1595(a)(c), and 22 U.S.C. § 401(a).

All parties now move for summary judgment.[1]  The Museum

---

[1] The Parties rely on the following submissions and the
exhibits attached thereto:  Amended Memorandum of Law in
Support of Motion by the Leopold Museum for Summary
Judgment ("LM Mem."); The Leopold Museum's Amended 2008
Statement of Undisputed Material Facts Pursuant to Local
Rule 56.1 ("LM 56.1 Stmt."); Declaration of Rudolf Leopold,
sworn to February 29, 2008 ("RL Decl."); Declaration of
Elizabeth Leopold sworn to February 29, 2008 ("EL Decl.");
Declaration of Martin Eder sworn to February 27, 2008
("Eder Decl."); Declaration of Romana Schuler sworn to
October 5, 2004 ("Schuler Decl."); Declaration of Peter
Konwitschka sworn to March 7, 2008 ("First Konwitschka
Decl."); Declaration of Robert Holzbauer sworn to March 7,
2008 ("Holzbauer Decl."); Declaration of James Lide sworn
to March 5, 2008 ("Lide Decl."); Declaration of William M.
Barron sworn to March 7, 2008 ("Barron Decl."); Memorandum
of Law of Plaintiff United States of America and Claimant
Estate of Lea Bondi Jaray in Opposition to Claimant Leopold
Museum's Motion for Summary Judgment ("Joint Opp. Mem.");
Response by Plaintiff United States of America and Claimant
Estate of Lea Bondi Jaray to Claimant Leopold Museum's
Local Civil Rule 56.1 Statement ("Joint Counter 56.1
Stmt."); Declaration of Sharon Cohen Levin sworn to March
26, 2009 ("3/26/09 Levin Decl."); Declaration of Bonnie
Goldblatt, dated March 25, 2009 ("3/25/09 Goldblatt
Decl."); Declaration of Dr. Peter Lambert in Response to
Declaration of Dr. Peter Knowitschka sworn to March 26,
2009 ("Lambert Resp. Decl."); Reply Memorandum of Law in
Further Support of Motion by the Leopold Museum for Summary
Judgment ("LM Reply Mem."); Declaration of Martin Eder,
dated April 22, 2009 ("Eder Reply Decl."); Third
Declaration of Dr. Peter Konwitschka sworn to May 14, 2009
("Second Kownwitschka Decl."); Reply Declaration of William
M. Barron sworn to May 14, 2009 ("Barron Reply Decl.");
Amended Memorandum of Law of Plaintiff United States of
America and Claimant Estate of Lea Bondi Jaray in Support
of Their Motion for Summary Judgment ("Joint Mem.");
Amended Local Civil Rule 56.1 Statement of Material Facts
in Support of Joint Motion for Summary Judgment By
Plaintiff United States of America and Claimant Estate of
Lea Bondi Jaray ("Joint 56.1 Stmt."); Supplemental
Declaration of Sharon Cohen Levin sworn to February 26,
2009 ("Levin Supp. Decl."); Declaration of Sharon Cohen

(cont'd on next page)

seeks an order striking the Seizure Warrant whereby Wally was seized at the outset of this action, granting the Museum's claim to Wally, and releasing the Painting to the Museum. (Dkt. no. 219). The Government and the Estate seek a judgment declaring Wally forfeit.[2] (Dkt. no. 257.)  I conclude that there is a triable issue of fact as to whether Dr. Leopold, and thus the Museum, knew that Wally

---

(cont'd from previous page)

Levin Sworn to March 10, 2008 ("3/10/08 Levin Decl.");
Declaration of Bonnie Goldblatt sworn to March 10, 2008
(3/10/08 Goldblatt Decl."); Memorandum of Law in Oppostion
to Motion for Summary Judgment by Plaintiff and the Bondi
Estate ("LM Opp. Mem."); The Leopold Museum's Response to
the Amended Local Civil Rule 56.1 Statement of Plaintiff
and the Estate ("LM Counter 56.1 Stmt."); Opposition
Declaration of Rudolf Leopold sworn to June 4, 2008 ("RL
Opp. Decl."); Opposition Declaration of William M. Barron
sworn to March 26, 2009 ("Barron Opp. Decl."); Second
Declaration of Dr. Peter Konwitschka sworn to June 2, 2008
("Second Konwitschka Decl."); Second Declaration of Dr.
Robert Holzbauer sworn to March 12, 2009 ("Second Holzbauer
Decl."); Reply Memorandum of Law of Plaintiff United States
of America and Claimant Estate of Lea Bondi Jaray in
Further Support of Joint Motion for Summary Judgment
("Joint Reply Mem."); Declaration of Sharon Cohen Levin
sworn to May 14, 2009 ("5/14/09 Levin Decl."); and the
Declaration of Anna E. Arreola sworn to May 14, 2009
("Arreola Decl.").

[2] Unless otherwise noted, this Memorandum hereafter refers only to the Government's position on the instant motion, with the understanding that the Estate shares that position.  Because the Government instituted this civil forfeiture proceeding, it is the only party that can properly be termed a Plaintiff.  The Estate, like the Museum, is a claimant, although it joins in the Government's application because the Government has represented that should Wally be forfeit, it will give the Painting to the Estate.  Thus, the Museum is the only party opposing forfeiture at this stage.

was stolen when they imported it to the United States. Accordingly, both motions are DENIED.

## I.   BACKGROUND

### A.   Factual Backround[3]

Egon Schiele painted Wally in 1912. (Joint 56.1 Stmt. ¶ 2.)  The oil-on-wood painting measures 32.7 x 39.8 cm and depicts Valerie Neuzil, Schiele's primary model and his lover from about 1911 until he married Edith Anna Harms in 1915. (Id. ¶¶ 3-4, 47; Third Am. V. Compl. ¶ 1.)  The artist inscribed only "EGON SCHIELE, 1912" on the work. (LM 56.1 Stmt ¶ 16; Third Am. V. Compl. ¶ 1.)  In the decades following World War II, Schiele became one of the most prominent Austrian artists of the twentieth century. (LM Counter 56.1 Stmt. ¶ 5.)  Hence, in 2002, the Painting was valued in excess of $2 million. (Joint 56.1 Stmt. ¶ 137.)

Bondi, an Austrian Jew and owner of an art gallery in Vienna (the "Würthle Gallery") acquired Wally some time before 1925. (Joint 56.1 Stmt. ¶¶ 6-8.)  Thereafter, although she occasionally showed it in exhibitions, Bondi primarily kept Wally hanging in her own apartment. (Id. ¶ 10.)  In 1937, because of financial difficulties, she

---

[3] Unless otherwise indicated, the following facts are undisputed.

4

began negotiating the sale of the Würthle Gallery to
Friedrich Welz ("Welz"). (LM 56.1 Stmt. ¶ 2.)  However, the
parties failed to reach an agreement at that time. (Id.)

     In March of 1938, in what is known as the Anschluss,
German troops occupied Austria and annexed it to Germany.
(Joint 56.1 Stmt. ¶ 11.)  Pursuant to German Aryanization
laws prohibiting Jews from owning businesses, the Würthle
Gallery was designated as "non-Aryan" and subject to
confiscation. (Id. ¶ 14; Joint Counter 56.1 Stmt. ¶ 3.)
Around March 13, 1938, Bondi reopened negotiations for the
sale of the Würthle Gallery to Welz. (Joint Counter 56.1
Stmt. ¶ 3.)  She ultimately sold it to him for 13,550
Reichsmarks. (LM 56.1 Stmt. ¶ 4.; 3/10/08 Levin Decl. Ex.
11 at LM 1662.)

     While the Government and the Museum dispute whether
this transaction was voluntary, there is no doubt that Welz
became an official member of the National Socialist German
Workers, or Nazi, Party shortly thereafter. (Joint Counter
56.1 Stmt. ¶ 4; Joint 56.1 Stmt. ¶¶ 15-16.)  He
subsequently obtained permission to Aryanize the Würthle
Gallery on March 15, 1939. (Joint 56.1 Stmt. ¶ 13.)  The
following month, Bondi and her husband emigrated to
England. (LM Counter 56.1 Stmt. ¶ 20; LM 56.1 Stmt. ¶ 1.)

i)   *Wally* transferred to Welz

The circumstances under which Welz gained possession of the Painting are hotly contested. The Government contends that in 1939, on the eve of Bondi's escape to England, Welz went to her apartment to discuss the Würthle Gallery. (Joint 56.1 Stmt. ¶¶ 17, 20.) He saw Wally hanging on the wall and demanded that Bondi hand it over. (Id. ¶ 18.) She resisted, explaining that the Painting was part of her private collection and had never been part of the gallery. (Id.) However, she ultimately relented at the behest of her husband, who reminded her that they intended to flee Austria and that Welz could prevent their escape. (Id.) Welz did not compensate her for the Painting. (Id. ¶ 19.)

The Museum, on the other hand, raises a host of evidentiary objections to the Government's narrative, discussed in Part II(B)(ii)(2)(b) infra, contending that it is pure fiction. The Museum maintains, and the Government disputes, that Bondi sold Wally to Welz as part of the Würthle Gallery in 1938, more than a year before she left for England, in exchange for 200 Reichsmarks. (LM 56.1 Stmt. ¶ 5; LM Counter 56.1 Stmt. ¶¶ 18-19.)

### ii. Welz acquires Schiele works from the Riegers

In 1938, Dr. Heinrich Reiger, a Jewish dentist and well-known collector of Schiele's works, approached Welz to negotiate the sale of his art collection to finance his emigration from Austria. (LM 56.1 Stmt. ¶¶ 11-12.) In or about 1939 or 1940, Welz acquired Schiele drawings and paintings from Dr. Rieger. (Joint 56.1 Stmt. ¶¶ 21-23.) Dr. Reiger and his wife, Berta, did not escape the Holocaust; they died in the Theresienstadt concentration camp in or about 1942. (Joint 56.1 Stmt. ¶ 25.)

### iii. United States forces gain possession of *Wally*

United States forces occupied Austria in May 1945, after the end of World War II in Europe. (Joint 56.1 Stmt. ¶ 26.) They arrested and detained Welz for approximately two years. (3/10/08 Levin Decl. Ex. 11 at LM 0584.) They also seized Welz's property, including artworks he acquired from Bondi and the Rieger collection. (See Joint 56.1 Stmt. ¶ 33; 3/10/08 Levin Decl. Ex. 11 at LM 0584.) While the parties dispute the timing and circumstances of the seizure (LM 56.1 Stmt. ¶ 14; Joint 56.1 Stmt. ¶¶ 32-33), they acknowledge that, by military decree, United States forces were authorized to seize various categories of property,

7

including property belonging to the Third Reich, Austrian Public Institutions, and all persons detained by the military. (Joint 56.1 Stmt. ¶ 27.) Nor do they dispute that Wally was among the seized property. (LM Counter 56.1 Stmt. ¶ 32.)

United States Forces in Germany and Austria were directed to restore works of art that had been taken from Austria by Germany or from other countries into Austria or Germany "to the government of the country from which it was taken or acquired in any way . . . upon submission of satisfactory proof of its identifiability by the claimant government." (Joint 56.1 Stmt. ¶ 28.)[4] The Reparations, Deliveries, and Restitution Division ("RDR") of the U.S. Forces was charged with executing this task. (Id. ¶ 30.)

On or about May 16, 1947, Robert Rieger, Dr. Rieger's son, engaged attorneys Dr. Oskar Mueller ("Mueller") and Dr. Christian Broda ("Broda") to help him and his niece, Tanna Berger (collectively, the "Rieger heirs"), recover

---

[4] The Museum objects that this provision could not have applied to Wally because on its face it applied to "restitution from Germany and Austria to Italy, Hungary, Rumania, and Finland, and from Germany to Austria," and Wally never left Austria. (LM Counter 56.1 Stmt. ¶ 28.) This interpretation is unduly restrictive. It is undisputed that Germany "incorporated Austria into Germany" in the Anschluss; therefore property need not have left Austria to have been seized by Germany and thus require restitution to Austria after the War. (Joint 56.1 Stmt. ¶ 11.)

8

property the Nazis had taken from their family. (Id. ¶¶ 43-
44.)  Broda wrote to the RDR, requesting that it prevent
Welz from reacquiring or hiding art he had obtained from
the Rieger collection, including Schiele works identified
as "Liebespaar" ("Lovers"), "Kardinal und Nonne" ("Cardinal
and Nun") and "Bildnis seiner Frau" ("Portrait of His
Wife"). (Id. ¶ 48.)  Broda's letter made no explicit
reference to a Schiele painting called "Portrait of Wally"
or depicting Valerie Neuzil. (See id.)

### iv.  United States Forces Deliver *Wally* to the BDA

Broda also wrote to Dr. Otto von Demus ("Demus"),
Director of the Bundesdenkmalamt, the Austrian Federal
Office for the Preservation of Historical Monuments (the
"BDA"), seeking that entity's assistance in locating
Rieger's Schiele collection. (Id. ¶ 49.)  He attached a
preliminary list of artworks, which included a painting
entitled "Bildnis seiner Frau" ("Portrait of His Wife") but
none entitled "Portrait of Wally" or described as depicting
Valerie Neuzil. (Id.)  In August of 1947, Mueller also
wrote the BDA, noting that several Schiele works, including
"Portrait of his Wife," remained missing. (Id. ¶ 50.)

In November of 1947, the RDR reported that it had possession of several "paintings" claimed by the Rieger heirs, including "Embrace," "Cardinal and Nun," and "His Wife's Portrait" by Egon Schiele. (Id. ¶ 51; see also 3/10/08 Levin Decl. Ex. 11 at LM 0589-0590.) On or about December 4, 1947, it released fourteen "paintings" United States forces had seized from Welz to the BDA, as representative of the government of Austria, in an agreement (the "Receipt and Agreement") whereby the BDA agreed to "h[o]ld [them] as Custodians pending the determination of the lawful owners thereof." (Joint 56.1 Stmt. ¶ 52; 3/10/08 Levin Decl. Ex. 11 at LM 0211.) The three Schiele paintings listed in the schedule attached to the Receipt and Agreement are "Embrace," "Cardinal and Nun," and "His Wife's Portrait." (3/10/08 Levin Decl. Ex. 11 at LM 0213.) They are described as "[p]aintings purchased during the war by Frederic Wels, Salzburg, from the confiscated collection of Dr. Heinrich Reiger (deceased), former Jew of Vienna, and recovered from his collection in Salzburg." (Id.)

Wally was among the paintings the RDR delivered to the BDA at this time. (Joint 56.1 Stmt. ¶ 55; LM 56.1 Stmt. ¶ 24.) The Museum contends that the painting referred to as "His Wife's Portrait" in the Receipt and Agreement was

10

Wally. (LM Counter 56.1 Stmt. ¶ 52.)  It does not, however,

offer any justification for viewing Wally as having been

part of the Rieger collection.  The Government, on the

other hand, argues that "Portrait of His Wife" refers to an

entirely different artwork, a drawing rather than a

painting, and the RDR delivered Wally by mistake. (Joint

56.1 Stmt. ¶ 55.)  Yet it does not identify another Schiele

artwork to which "Portrait of his Wife" might have

referred.

It is undisputed that approximately one month after

the transfer, James Garrison ("Garrison"), Chief of the

RDR, provided the BDA with a list of paintings confiscated

from Welz that were cleared for release to the Salzburg

government on December 19, 1947. (Joint 56.1 Stmt. ¶ 54.)

Wally appears at number 573 of this list, followed by the

parenthetical remark "this is a portrait of a woman named

Vally," described as being located at the Residenz Depot in

Salzburg. (Id. ¶ 54.)  However, as noted above, the

Painting had already been delivered to the BDA on December

4 among the paintings Welz acquired from Dr. Rieger.

Around June 8, 1948, Lieutenant Colonel McKee

("McKee") of the RDR wrote to the United States Forces,

Property Control and Restitution Section, attaching a list

of Rieger collection paintings acquired by Welz but still

11

missing. (3/10/08 Levin Decl. Ex. 11 at 1282-86.)  "His
Wife's Portrait" is number three on the list. (Id.)  Next
to this entry, McKee wrote "Released to [BDA] 4 Dec 47 but
this painting is not under control unless it is identical
with 'VALLY FROM KRUMAU.' - Wels #573 Wels' records do not
state acquired from Reiger and Wels says this woman was not
the artist's wife." (3/10/08 Levin Decl. Ex. 11 at LM 1283
(emphasis in original).)  McKee's cover letter states that
"inquiry will be made with the [BDA] as to whether or not
'Vally from Krumau' was Egon Schiele's wife." (Id. at LM
1282.)  The BDA received McKee's letter around June 14,
1948. (Joint 56.1 Stmt. ¶ 56.)  A handwritten note on the
BDA's copy of the letter says "Dr. Demus." (Id.)

     Broda and Mueller's efforts on behalf of the Rieger
heirs during this period were not limited to correspondence
with the RDR and the BDA.  They also initiated formal
proceedings with an Austrian Restitution Commission.[5] (See
Joint 56.1 Stmt. ¶¶ 45, 57.)  On or about June 26, 1948,
Broda sent a letter to the BDA enclosing a "Partial
Finding" of the Restitution Commission ordering Welz to

---

[5] As noted in Judge Mukasey's decision denying the Museum's
motion to dismiss the Third Amended Complaint, Restitution
Commissions were established at each of the Austrian
provincial courts and presided over by a professional
judge. United States v. Portrait of Wally, No. 99 Civ.
9940, 2002 WL 553532, at *2 n.1 (S.D.N.Y. April 12, 2002).

return twelve works of art to the Rieger Heirs. (Joint 56.1
Stmt. ¶ 57; 3/10/08 Levin Decl. Ex. 11 at LM 1276-77.)
Listed among these is "Portrait of his Wife," described as
a "drawing." (Joint 56.1 Stmt. ¶ 57; 3/10/08 Levin Decl.
Ex. 11 at LM 1276-77.)  There is no explicit reference to
Wally.  Mueller sent another letter to the BDA on September
12, 1949, enclosing another copy of the Restitution
Commission's Partial Finding. (Joint 56.1. Stmt. ¶ 58;
3/10/08 Levin Decl. Ex. 11 at LM 1266-68.)

On October 28, 1949, Demus responded that the BDA
possessed twelve "pictures from the possession of Dr.
Rieger," only eight of which had been identified in the
Restitution Commission's Partial Finding, among them
"Portrait of his Wife." (3/10/08 Levin Decl. Ex. 11 at
001819.)  He made no mention of McKee's letter indicating
that the "Portrait of his Wife" delivered to the BDA as
part of the Rieger collection may actually have been "Vally
from Krumau."

## v.    *Wally* Goes to the Rieger Heirs

By letter dated May 10, 1950, the Austrian Federal
Ministry of Finance consented to the BDA's restitution of
several "paintings," including Schiele's "Portrait of His
Wife," to the Rieger heirs. (RL Decl. Ex. X at LM 1411.)

13

An agent of the Rieger heirs received the artworks on July 7, 1950. (Joint 56.1 Stmt. ¶ 61; 3/10/08 Levin Decl. Ex. 11 at LM 2036-37.)  Although not explicitly referenced, Wally was included in the delivery. (See LM 56.1 Stmt. ¶¶ 26-27; Joint 56.1 Stmt. ¶¶ 61, 68-69.)

vi.  *Wally* Goes to the Belvedere

In late 1950, the Rieger heirs negotiated the sale of art from the Rieger collection to the Österreichische Galerie Belvedere (the "Belvedere"), a national gallery owned by the Austrian government. (Joint 56.1 Stmt. ¶¶ 65, 67.)  Belvedere officials, including its Director, Dr. Garzarolli ("Garzarolli"), his deputy, Dr. Novotny ("Novotny"), and a lecturer, Dr. Balke ("Balke"), inspected the items proposed for sale on November 30, 1950. (Joint 56.1 Stmt. ¶ 68; 3/10/08 Levin Decl. Ex. 11 at 000274.) Garzarolli sent a letter the next day cataloguing the items inspected by his team. (Joint 56.1 Stmt. ¶ 70.)  Number three on the list is "Frauenbildnis" ("Portrait of a Woman"). (Id.)  Next to this entry appears a handwritten note stating "Vally Neuzil aus Wien" ("Wally Neuzil from Vienna"). (Id. ¶ 70.)  A handwritten list from the Belvedere's files for the year 1950, signed by Balke, does not include "Portrait of a Woman" but instead lists "E.

14

Schiele, Vally aus Krumau" ("Wally from Krumau") at number
three. (Id. ¶ 71.)

In early December of 1950, Garzarolli sought
permission from the Austrian Federal Ministry of Education
for the Belvedere's purchase of the artworks he, Balke, and
Novotny had inspected on November 30. (Id. ¶ 75.)   The
Ministry approved purchase of eleven pictures, including
three by Schiele described as "Umarmung" ("Embrace"),
"Kardinal und Nonne" ("Cardinal and Nun"), and
"Frauenbildnis" ("Portrait of a Woman"). (Id. ¶ 76.)   The
contract of sale between the Rieger heirs and the
Belvedere, dated December 27, 1950, identifies the same
three Schiele paintings. (3/10/08 Levin Decl. Ex. 11 at
000158 ILS.)   Although not explicitly referenced in either
the Ministry of Education approval or the contract of sale,
Wally was included in the exchange. (See LM 56.1 Stmt. ¶¶
27-28; accord Joint 56.1 Stmt. ¶¶ 69, 76-77.)


### vii. Bondi's Restitution Proceeding

After the war, Bondi, like the Rieger heirs, actively
sought to recover property acquired by the Nazis.   On her
behalf, Viennese lawyer Dr. Emerich Hunna ("Hunna")
initiated a proceeding against Welz before an Austrian

Restitution Commission. (See LM 56.1 Stmt. ¶ 6; Joint 56.1 Stmt. ¶ 34.)  Although the exact claims and evidence she presented to the Restitution Commission are unknown, it is clear that Bondi sought return of the Würthle Gallery on the grounds that she had been forced to sell it due to Nazi persecution. (LM Counter 56.1 Stmt. ¶ 34; 3/10/08 Levin Decl. Ex. 11 at LM 1661-63.)

In a Partial Decision rendered in March of 1948, the Restitution Commission ordered Welz to return the Würthle Gallery to Bondi. (3/10/08 Levin Decl. Ex. 11 at LM 1661-63.)  The Commission noted that "[d]uring the course of the evidentiary procedure no facts of the case could be determined that showed that [Bondi] would have sold [the Gallery] without being persecuted due to the national socialist seizure of power." (Id. at LM 1663.)  The Commission further stated that "[Welz] did not always conduct himself in a fair and generous matter, e.g. . . . when he demanded a 'Biedermeier table and a Schiele from [Bondi].'" (Id. at LM 1661.)  However, the Commission also observed that "based on the evidentiary procedure to date, [it] has not come to the conclusion that [Welz] conducted himself improperly or that he did not adhere to the rules of honest dealings." (Id.)  Another ground for this characterization of Welz's behavior was that he "caused no

16

difficulties for [Bondi] as he easily could have done."
(Id.)

Welz appears to have unsuccessfully appealed the
partial finding, relying in part on the Commission's
observation that "he had observed the rules of fair
business dealings." (3/10/08 Goldblatt Decl. Ex. 7 at
LB000883; Ex. 8 at US 001943.)  With regard to this point,
Bondi argued that Welz unfairly "beat down even the low
price that I demanded." (3/10/08 Goldblatt Decl. Ex. 7 at
LB000883.)  She further asserted that Welz had improperly
"demand[ed] objects from [Bondi's] private assets . . . ,
the handover of which had never been discussed." (Goldblatt
Decl. Ex. 7 at LB000884.)

The parties subsequently reached an undisclosed
settlement agreement, approved by the Commission in August
of 1949, by which Bondi regained possession of the Würthle
Gallery and "all mutual claims [were] executed." (3/10/08
Goldblatt Decl. Ex. 8 at US 001943-44.)  Although Bondi
thus regained possession of her gallery, she never
recovered Wally.

### viii.    Bondi Meets Dr. Leopold

Dr. Rudolph Leopold ("Dr. Leopold") is an Austrian
citizen and resident born in March of 1925. (Joint 56.1

Stmt. ¶ 79.) He began studying medicine in 1945 and earned his doctorate in 1953, when he also married his wife, Elisabeth. (Joint 56.1 Stmt. ¶ 80.) During the 1950s, he took a particular interest in Schiele's works, acquiring a considerable number of them by 1956. (Joint 56.1 Stmt. ¶ 81.)

In 1953, Dr. Leopold went to London to meet with art collector Arthur Stemmer ("Stemmer"), who told him to visit Bondi and gave him her address. (Joint 56.1 Stmt. ¶ 82.) Dr. Leopold had heard of Bondi by this time. (LM 56.1 Stmt. ¶ 36; Joint 56.1 Stmt. ¶ 83.) He knew that she was the Jewish owner of the Würthle Gallery, that she had fled Austria due to Nazi persecution, and that the gallery had been restituted to her. (Joint 56.1 Stmt. ¶ 83.)

After meeting with Stemmer, Dr. Leopold visited Bondi in London and bought several artworks from her. (Joint 56.1 Stmt. ¶ 84.) Over the course of this transaction, Bondi asked Dr. Leopold where Wally was. (Joint 56.1 Stmt. ¶ 85.) Dr. Leopold knew that Bondi had owned Wally because she was listed as its owner in a 1930 art catalogue compiled by Otto Kallir (the "1930 Kallir Catalogue"). (LM 56.1 Stmt. ¶ 37.) He told her the painting was at the Belvedere. (Joint 56.1 Stmt. ¶ 85.) According to Dr. Leopold's 2006 deposition testimony, Bondi responded "but it is mine.

18

Please go to the [Belvedere], get painting [sic], and then ship it to me." (3/10/08 Levin Decl. Ex. 9, Leopold Dep. 19:17-18, Oct. 16, 2006; accord Joint 56.1 Stmt. ¶ 85.) The Museum asserts, and the Government disputes, that Dr. Leopold subsequently set up a meeting between Bondi and the Belvedere's Garzarolli and, although she met with him twice, Bondi never laid claim to Wally. (Joint Counter 56.1 Stmt. ¶¶ 40-44.)   The Museum also makes the contested claim that Dr. Leopold and Bondi met again in the summer of 1954, whereupon he asked her why she had not claimed Wally from the Belvedere, and she told him to "drop it." (RL Decl. ¶ 23; Joint Counter 56.1 Stmt. ¶ 45.)

### ix.   Dr. Leopold Acquires *Wally*

In June of 1954, Dr. Leopold and Garzarolli discussed how Dr. Leopold might acquire "Cardinal and Nun" and Wally from the Belvedere in exchange for other paintings. (Joint 56.1 Stmt. ¶ 88.)   Dr. Leopold proposed trading the Schiele painting "Rainerbub" for Wally. (Joint 56.1 Stmt. ¶ 90.) Correspondence between Dr. Leopold and the Belvedere on this topic repeatedly referenced the 1930 Kallir Catalogue, which listed Bondi as Wally's last owner. (Joint 56.1 Stmt. ¶ 89.)   At a July 12, 1954 meeting attended by Garzarolli and Novotny, the Exchange Commission of the Belvedere

approved the trade. (Joint 56.1 Stmt. ¶ 91.)  Minutes of the meeting refer to Wally not as "Portrait of His Wife," but rather as "Vally aus Krumau." (Id.)

Upon the Belvedere's application, the Austrian Federal Ministry of Education then approved the exchange of "Vally aus Krumau" for "Rainerbub." (Joint 56.1 Stmt. ¶¶ 93-95.) This approval appears to have been rushed "[d]ue to the subsequent threat of one picture owner to withdraw his offer if the exchange were further delayed." (3/10/08 Levin Decl. Ex. 11, LM 1816 (referring to exchange approval in July 12 minutes); see also RL Decl. Ex. F at LM 1795 (July 12 minutes).)  Dr. Leopold acquired Wally on September 1, 1954. (LM 56.1 Stmt. ¶ 52A.)  He did not inform Bondi of either his intention to acquire Wally or his realization of this goal. (Joint 56.1 Stmt. ¶ 98.)  Nor did he ask the Belvedere for any documentation showing that Wally truly had been restituted to the Rieger heirs. (Joint 56.1 Stmt. ¶ 100.)

### x.   Dr. Hunna Contacts Dr. Leopold

On October 23, 1957, Hunna wrote Dr. Leopold on behalf of Bondi. (Joint 56.1 Stmt. ¶ 107; RL Decl. Ex. N at LM 3832-33.)  The letter recalled the 1953 meeting of Bondi and Dr. Leopold in London, which it asserts ended with Dr.

Leopold's pledge to help Bondi recover the painting. (Id.)
Hunna wrote that Bondi had just discovered that Dr. Leopold
now possessed Wally and wondered whether he had acquired it
from the Belvedere "based on [Bondi's] request that [Dr.
Leopold] represent her interests, and [had] just not
reported this to her yet." (Id.) "[I]n any case," wrote
Hunna, "I ask you to explain." (Id.)

Dr. Leopold responded in a letter dated October 16,
1957, saying that Hunna's letter "concealed many important
facts" and giving the following account of his 1953 meeting
with Bondi and subsequent events. (RL Decl. Ex. O at LM
1255-56.) According to Dr. Leopold, he told Bondi to
contact the Belvedere or hire an attorney, but she
prevailed on him to speak personally with Belvedere
representatives. (Id. at LM 1255.) He then spoke with
Garzarolli, who said he "had never heard of" Bondi's claim
and assured him that Wally had been properly restored to
the Rieger heirs from whom the Belvedere had acquired it.[6]
(Id.) Dr. Leopold met Bondi in Vienna soon after his
meeting with Garzaroli and again advised her to claim the
painting. (Id.) Bondi herself, when Dr. Leopold met her on

---

[6] The Government disputes this assertion. (Joint Counter
56.1 Stmt. ¶ 41.) Relying on documents to which the
Leopold objects as inadmissible, the Government asserts
that Bondi indeed presented her claim to Wally to the
Belvedere, to no avail. (See id.)

a second trip to London that occurred "somewhat later," confirmed that she did not follow his advice.[7] (Id.) Because it was "clear that [Bondi] no longer had an ownership right to [Wally]," Dr. Leopold took the "unpleasant route of giving up something important from [his] collection" in exchange for it. (Id.)  He desired Wally because he anticipated acquiring a counterpart self-portrait Schiele had painted the same year. (Id.)  However, before proceeding with the exchange, Dr. Leopold again spoke with Garzarolli, who reiterated that Bondi had never claimed Wally from the Belvedere. (Id.)

Hunna replied by letter dated November 12, 1957. (3/10/08 Levin Decl. Ex. 11 at LM 3830-31.)  He wrote that Bondi had by no means "waived her ownership right" to Wally, which had been included in the Rieger collection by mistake, and asked that Dr. Leopold return it. (Id.)

Garzarolli responded on Dr. Leopold's behalf by letter dated December 3, 1957. (RL Decl. Ex. Q at LM 3829.)  He wrote that the Belvedere had lawfully acquired Wally from the Rieger heirs and reiterated Dr. Leopold's previous assertion that Bondi had never laid claim to the Painting. (Id.)

---

[7] As noted above, the Government also disputes this assertion.

After this exchange of letters, Dr. Leopold received no further communication regarding Wally from either Bondi or Hunna. (LM 56.1 Stmt. ¶ 62.)

### xi.   Bondi's Account of Her Efforts to Retrieve *Wally*

Bondi died in 1969. (LM 56.1 Stmt. ¶ 1.)   Based on her correspondence and an unsigned statement found in her bureau more than twenty years after her death, the Government offers the following disputed account of her post-war efforts to recover Wally.[8]   Before she met Dr. Leopold in London, Bondi saw Wally at the Belvedere and claimed it as her own but "did not receive any reply." (3/10/08 Levin Decl. Ex. 14 at US 000156; see Joint 56.1 Stmt. ¶ 41.)   She did not further pursue the claim because she had regained the Würthle Gallery and, apparently for business reasons, "it was not possible for [her] to quarrel with the [Belvedere]." (3/10/08 Levin Decl. Ex. 14 at US 000156.)

---

[8] For the sake of completeness, this account will be briefly presented here despite the Leopold's multiple evidentiary objections, which are discussed in Part II(B)(ii)(2)(b), infra.

In 1953, she met Dr. Leopold in London and asked him to bring her ownership to the Belvedere's attention. (3/10/08 Levin Decl. Ex. 12 at JK 000053-54.)  When she subsequently discovered that Dr. Leopold had acquired Wally for himself, she asked Hunna to shame him publicly into returning the Painting, being reluctant to litigate the matter because "[i]t is probably very hard to have lawsuits in Vienna against a medical doctor residing in Vienna because the judges always take the side of the resident of Vienna, and if the lawsuit is lost, I have lost my picture forever." (Id.)  Although Bondi never filed a formal lawsuit, she continued her efforts to recover Wally. (Joint 56.1 Stmt. ¶ 116.)  She sought the assistance of Otto Kallir ("Kallir"), author of the 1930 Kallir catalogue, in this endeavor, but he did not secure the Painting for her. (See id. ¶¶ 112-15.)

### xii. The Pre-Museum Catalogues

In 1966, Kallir published a new catalogue raisonné[9] on Schiele's work (the "1966 Catalogue"). (Joint 56.1 Stmt. ¶ 118.)  This catalogue listed Wally's provenance as follows:

---

[9] "A catalogue raisonné is a definitive listing and accounting of the works of an artist." DeWeerth v. Baldinger, 836 F.2d 103, 112 (2d Cir. 1987).

> Emil Toepfer, Vienna
> Richard Lanyi, Vienna
> Lea Bondi, Vienna
> Dr. Rudolph Leopold, Vienna

(Id. ¶ 118.)  Six years later, Dr. Leopold published a book

entitled Egon Schiele, Gemälde Aquarelle Zeichnungen ("Egon

Schiele:  Paintings, Watercolours, Drawings"), which

included a section with the provenance of featured

paintings (the "1972 Book"). (Joint 56.1 Stmt. ¶¶ 119,

122.)  For those already listed in the 1966 Kallir

catalogue, the 1972 Book gave only the first and last

owners unless that information needed "to be corrected or

substantially supplemented." (Joint 56.1 Stmt. ¶ 122;

5/14/09 Levin Decl. Ex. 4 at LB 000255.)  The provenance

for Wally lists only Emil Toepfer and "private collection,

Vienna," the latter being a reference to Dr. Leopold

himself. (Joint 56.1 Stmt. ¶ 123.)  There is no reference

to the Rieger heirs ever having owned Wally. (Id. ¶ 125.)

A 1990 catalogue raisonné on Schiele prepared by Jane

Kallir, Otto Kallir's granddaughter, likewise makes no

mention of the Rieger heirs in Wally's provenance. (LM 56.1

¶ Stmt. ¶ 72; Joint 56.1 Stmt. ¶ 126.)

### xiii.      The Museum Acquires *Wally*

Dr. Leopold sold his art collection, including Wally,
to the newly established Museum on August 8, 1994. (Joint
56.1 Stmt. ¶ 131; LM 56.1 Stmt. ¶ 67.)  As part of that
transaction, Dr. Leopold became the Museum's "Museological
Director" for life, with the power to appoint half of the
Museum's Board of Directors and his own seat on the same.
(See Joint 56.1 Stmt. ¶ 132.)

### xiv. Dr. Leopold Revises *Wally*'s Provenance

In 1995, the Museum prepared a catalogue for three
upcoming exhibitions of its Schiele collection in Germany.
(Joint 56.1 Stmt. ¶ 127; LM 56.1 Stmt. ¶ 68.)  Romana
Schuler, Dr. Leopold's assistant at the Museum, suggested
that the catalogue for the exhibited works be expanded to
include every interim possessor to the extent available.
(See LM 56.1 Stmt. ¶ 69; Joint 56.1 Stmt. ¶ 127.)  The
expanded provenance for Wally, which was authored by Dr.
Leopold, reads as follows:

> Emil Toepfer, Wien
> Richard Lanyi, Wien
> Lea Bondi Jaray, Wien, später London
> Heinrich Rieger, Wien
> Rieger, Jr., London
> Österrichische Galerie, Wien
> Rudolf Leopold, Wien.

(Joint 56.1 Stmt. ¶ 129.)

xv.   *Wally* Enters the United States

Two years later, the Museum loaned part of its Schiele collection to New York's Museum of Modern Art (the "MOMA"). Both Dr. Leopold and the Museum's Commercial Director, Dr. Klaus Albrecht Schröder, signed the loan agreement (the "1997 Agreement") on its behalf. (RL Decl. Ex. T at LM 2067.)  In addition to specifying agreed-upon agents for "import/export formalities" in Europe and the United States, the 1997 Agreement provided that "the transportation shall be organized by the [MOMA]. . . but always by mutual agreement with, and with the consent of the [Museum]." (RL Decl. Ex. T at LM 2059.)  The Schiele works, including Wally, were shipped to New York in September of 1997. (Joint 56.1 Stmt. ¶ 136.)


B.   PROCEDURAL HISTORY

The MOMA exhibited Wally from October 8, 1997 to January 4, 1998. United States v. Portrait of Wally, 105 F. Supp. 2d 288, 290 (S.D.N.Y. 2000) (hereafter "Wally I"). Three days after the exhibit ended, the New York District Attorney's Office issued a subpoena for the painting, which, on September 21, 1999, the New York Court of Appeals quashed as issued in violation of Section 12.03 of New York's Arts and Cultural Affairs Law. See Matter of the

27

Grand Jury Subpoena Duces Tecum Served on Museum of Modern
Art, 93 N.Y.2d 729 (1999).  United States Magistrate Judge
James C. Francis IV then issued a seizure warrant for the
painting, and the Government initiated this forfeiture
action on September 22, 1999, alleging that the Leopold
imported and/or intended to export Wally knowing it was
stolen or converted. Wally I, 105 F. Supp. 2d at 290.

The ensuing years have seen a steady stream of motion
practice in this action.  On July 19, 2000, Judge Mukasey,
to whom this action was originally assigned, granted the
Museum's motion to dismiss the complaint. Id. at 294.  He
held that under the facts as alleged in the then-operative
complaint, the federal recovery doctrine, discussed in
further detail at Part II(B)(ii)(3)(a) infra, precluded a
finding that Wally was stolen. Id. at 292-94.  The
Government then moved for reconsideration and, in the
alternative, for an order altering the judgment so it could
file an amended complaint.  Judge Mukasey denied the
reconsideration motion but granted leave to amend,
reasoning in part that "[t]his case involves substantial
issues of public policy relating to property stolen during
World War II as part of a program implemented by the German
government . . . [and] I am loath to decide this case
without having all facts and theories considered . . . ."

United States v. Portrait of Wally, No. 99 Civ. 9940, 2000
WL 1890403, at *1 (S.D.N.Y. Dec. 28, 2000) (hereafter
"Wally II").  The Museum and the MOMA then moved, inter
alia, to dismiss the Government's Third Amended Complaint
and to dismiss or strike the claim of the Bondi heirs.  On
April 12, 2002, Judge Mukasey issued a detailed opinion
denying these motions.  United States v. Portrait of Wally,
No. 99 Civ. 9940 (MBM), 2002 WL 553532, at *33 (S.D.N.Y.
Apr. 12, 2002) (hereafter "Wally III").

After years of extensive discovery following the
issuance of Wally III, the parties now move for summary
judgment.


II.  DISCUSSION

The Museum argues that dismissal is warranted both
under the Act of State doctrine and in the interest of
international comity.  Should the Court reach the merits of
this action, the Museum then asserts that Wally was neither
stolen nor converted and, even if it were, the Museum had
no knowledge to that effect.  The Museum further contends
that suit is barred by the equitable defense of laches and,
finally, that Wally's forfeiture would violate due process.
For its part, the Government maintains that nearly all the
Museum's arguments are foreclosed by Judge Mukasey's

decision in Wally III and submits that it has adduced

sufficient proof that the Museum illegally imported Wally

knowing it was stolen to warrant immediate forfeiture.  As

explained below, I find that abstention is not warranted,

there is no genuine dispute that Wally was, and remains,

stolen, and the Museum's laches defense and constitutional

objections are without merit.  The trier of fact must,

however, determine whether Dr. Leopold, and hence the

Museum, knew Wally was stolen when shipped into this

country.

### A.   Abstention Doctrines

#### i.   The Act of State Doctrine

As it did in Wally III, the Museum argues that the Act

of State doctrine precludes adjudication of the present

controversy.  This doctrine bars U.S. courts from

invalidating the public acts of foreign sovereigns within

their own jurisdictions. See W.S. Kirkpatrick & Co. Inc. v.

Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 409 (1990);

see also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398,

401 (1964) ("The act of state doctrine in its traditional

formulation precludes the courts of this country from

inquiring into the validity of the public acts a recognized

foreign sovereign power committed within its own

territory."); Underhill v. Hernandez, 168 U.S. 250, 252 (1897) ("Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory."). However, in determining whether the doctrine applies, courts must be mindful of their obligation "to decide cases and controversies properly presented to them." W.S. Kirkpatrick, 493 U.S. at 409. This in turn requires consideration of the policies underlying the Act of State doctrine and "whether, despite the doctrine's technical availability, it should nonetheless not be invoked." Id. The Museum bears the burden of showing that abstention is justified. Bigio v. Coca-Cola Co., 239 F.3d 440, 453 (2d Cir. 2001).

In Wally III, the Leopold and MOMA argued that the Court was barred from revisiting the BDA's disposition of Wally to the Belvedere because the BDA was part of the Austrian government. 2002 WL 553532, at *8. Judge Mukasey questioned whether, in this instance, either the "act" or "state" requirements of the doctrine had been met, as it was unclear whether the BDA's allegedly erroneous delivery of Wally to the Belvedere qualified as an "act" and whether the BDA had governmental authority to restitute the

31

Painting. Id. at *8-9. He found, however, that it was unnecessary to resolve these questions because the policies underlying the Act of State doctrine did not require its application. Id. at 9. Judge Mukasey reasoned that the doctrine was intended to prevent United States courts "from inquiring into the validity of a foreign state's acts if adjudication would embarrass or hinder the executive in its conduct of foreign relations." Id. at *9 (citing Bigio, 239 F.3d at 452). Here, he found, "[a]n inquiry into the BDA's shipment of a painting under the post-war Austria regime would not impinge upon the executive's preeminence in foreign relations, particularly where the restoration of ownership has always been a professed goal of Austrian law and where it is the executive branch itself that brings this forfeiture action under United States law." Id.

The Museum now argues that this action must be dismissed because the Government is asking the Court to "disregard" three "express approvals" by the Austrian government: (1) the Austrian Ministry of Finance's May 10, 1950 letter consenting to the BDA's restitution of several paintings to the Rieger heirs; (2) the Austrian Federal Ministry of Education's December 13, 1950 approval of the Belvedere's acquisition of artworks from the Rieger heirs; and (3) the Ministry of Education's August 27, 1954

approval of the Belvedere's exchange of Wally for Dr.

Leopold's "Rainerbub." (LM Mem. 14-15.) The Museum

maintains that Wally III does not bar application of the

Act of State doctrine at this juncture because that

decision concerned a motion to dismiss, whereas the Court

may now consider documents outside the pleadings and is not

required to take all facts alleged in the complaint as

true. (LM Reply Mem. 18.)

Assuming the law of the case does not bar application

of the Act of State doctrine at this stage, the Museum has

not shown that the doctrine compels dismissal here. As a

threshold matter, the Court is not being asked to

invalidate any action by an Austrian governmental

authority, but only to determine the effect of such action,

if any, on Wally's ownership. See W.S. Kirkpatrick, 493

U.S. at 409-10 ("The act of state doctrine does not

establish an exception for cases and controversies that may

embarrass foreign governments, but merely requires that, in

the process of deciding, the acts of foreign sovereigns

taken within their own jurisdictions shall be deemed

valid."). Furthermore, as in Wally III, it is far from

clear that any of the "approvals" the Museum cites qualify

as state acts to which the doctrine applies. See Wally III

at *8-9. For example, the Museum has submitted nothing to

33

show that the BDA, the Austrian Ministry of Finance, or the Austrian Federal Ministry of Education had any authority "to dispose of artwork other than through the Restitution Commissions." See id. at *9. Also, although it speculates that the Restitution Commission may have addressed Wally's ownership during Bondi's restitution proceeding, the Museum has submitted no evidence supporting this assertion. (See LM Reply Mem. at 7, 18.) Rather, it acknowledges that the precise claims addressed therein are unknown. (See LM Counter 56.1 Stmt. ¶ 34; 3/10/08 Levin Decl. Ex. 11 at LM 1661-63.)

Finally, and perhaps most importantly, the Museum offers nothing to alter Judge Mukasey's determination that the balance of interests favors adjudication of this action. See Wally III, 2002 WL 553532, at *9. The Museum does not dispute his observation that the Act of State doctrine is intended to prevent courts from inquiring into the validity of foreign acts where doing so would "embarrass or hinder the executive in its conduct of foreign relations" and that this concern is not implicated here, where both the executive branch actively seeks adjudication of its claim and Austrian law favors restoration of ownership. Id. Accordingly, the Museum has

not demonstrated that the Act of State doctrine requires
abstention from this case.

### ii. International Comity

The Museum next argues that international comity
compels dismissal. As explained in Wally III, which the
parties agree fairly summarizes the relevant law (see LM
Reply Mem. 19 (stating that Wally III "sets out the
relevant law"); Joint Opp. Mem. 21 (same)),

"[i]nternational comity requires recognition of foreign
actions, decrees, and proceedings that do not conflict with
the interests or policies of the United States," Wally III,
2002 WL 553532, at *9 (citing Bigio, 239 F.3d at 454).
Such recognition "fosters international cooperation and
encourages reciprocity." Spatola v. United States, 925 F.2d
615, 618 (2d Cir. 1991). Whether to abstain on comity
grounds is within the Court's discretion. Bigio, 239 F.3d
at 454. In making this determination, the Court balances
the "interests of the respective forums and of
international policy." Wally III, 2002 WL 553532, at *9.

In Wally III, the Museum argued that the balance of
interests required deference to the Austrian restitution
system, which purportedly had a larger stake in the case
than does the United States. Id. Judge Mukasey disagreed,

finding that: (1) the Museum failed to identify any Austrian "action, proceeding, or decree" to which deference was owed; (2) Austrian courts were not vested with exclusive jurisdiction over claims involving Holocaust related property; (3) "there has been no formal or purposeful act of the Austrian judiciary, executive, or legislature with respect to [Wally] rising to a level that would implicate international comity"; and (4) the United States "has a strong interest in enforcing its own laws as applied to conduct on its own soil." Id. at *10.

The Museum's arguments in favor of its current motion do not support a different conclusion.  The Museum first argues that the 1947 Receipt and agreement between the RDR and the BDA "expressly gave Austria the responsibility for restitution of [Wally]." (LM Mem. 15.)  As the Government observes, this argument is simply a recharacterization of an argument already rejected by Judge Mukasey, namely that the Court should defer to the Austrian restitution system even if Bondi's claim was never adjudicated. See Wally III, 2002 WL 553532, at *10 ("[T]he principle of comity does not operate as a pre-emption doctrine, barring this court from hearing a valid forfeiture action merely because there are foreign laws that might also apply.").

Rather than respond to this point directly, the Museum makes a new argument in its reply, namely that the Austrian Federal Finance Ministry's May 10, 1950 approval of the BDA's restitution of Schiele artworks to the Rieger heirs requires deference. (LM Reply Mem. at 19.) However, the Museum offers no reason as to how this approval qualifies as a "formal or purposeful act of the Austrian judiciary, executive, or legislature with respect to [Wally] rising to a level that would implicate international comity." Wally III, 2002 WL 553532, at *10. Indeed, even assuming this approval qualified as such an act, it is not clear that the Court is being asked to countermand it, if for no other reason than that the approval in question does not explicitly refer to Wally but rather to a painting called "Portrait of His Wife," who was not Valerie Neuzil. (See RL Decl. Ex. X at LM 1411.) Finally, even assuming that Austrian governmental interests are implicated by adjudicating this case, the Museum has not specified why any such interest trumps the United States' "strong interest in enforcing its own laws as applied to conduct on its own soil." Wally III, 2002 WL 553532, at *10. Accordingly, I will not exercise my discretion to dismiss this action on the basis of international comity.

## B. Arguments on the Merits

Having disposed of the Museum's abstention arguments,
I now turn to the parties' substantive arguments.

### i. Legal Standards

Summary judgment is appropriate only if the evidence
demonstrates that "there is no genuine issue of material
fact and that the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(c). A factual dispute
is material if it could affect an action's disposition.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)
("Only disputes over facts that might affect the outcome of
the suit under the governing law will properly preclude the
entry of summary judgment.") Furthermore, there is no
genuine issue "[w]here the record taken as a whole could
not lead a rational trier of fact to find for the non-
moving party." Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 587 (1986). With respect to each
motion, evidence must be construed in the light most
favorable to the non-movant. Lucente v. Int'l Bus. Machs.
Corp., 310 F.3d 243, 253 (2d Cir. 2002).

The Government seeks forfeiture under 19 U.S.C.
§ 1595a(c) and 18 U.S.C. § 545 claiming that the Museum
knowingly imported Wally "contrary to law" insofar as it

38

did so in violation of the NSPA.[10] An NSPA violation consists of three elements: "(1) the transportation in interstate or foreign commerce of property, (2) valued at $5,000 or more, (3) with knowledge that the property was

---

[10] 19 U.S.C. § 1595a(c) provides, in relevant part:

> Merchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows:
>
> > (1) The merchandise shall be seized and forfeited if it—
> >
> > > (A) is stolen, smuggled, or clandestinely imported or introduced;
> > > . . .

18 U.S.C. § 545 provides, in relevant part:

> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law--
>
> Shall be fined under this title or imprisoned not more than 20 years, or both. . . .
>
> Merchandise introduced into the United States in violation of this section . . . shall be forfeited to the United States.

The Government also initiated this action under 22 U.S.C. § 401(a), which provides for forfeiture of property exported in violation of law. However, it has not briefed this ground for forfeiture, asserting that the Court need not address it to find in its favor. (Joint Mem. 10 n.9.)

39

stolen, converted, or taken by fraud."[11] Wally III, at *12
(quotation marks omitted); 18 U.S.C. § 2314; Dowling v.
United States, 473 U.S. 207, 214 (1985); United States v.
Wallach, 935 F.2d 445, 466 (2d Cir. 1991). In this case,
the parties concede that Wally is worth more than $5,000.
(Joint 56.1 Stmt. ¶ 137.) This Court's task is therefore
to determine whether it is genuinely disputed that the
Museum imported Wally from abroad knowing the Painting was
stolen or converted.

Although the parties dispute the relevant burden of
proof, they agree that the Court of Appeals' decision in
United States v. Parcel of Prop. (Aguilar), 337 F.3d 225
(2d Cir. 2003) controls the issue. (Joint Mem. 2-4; LM Opp.
Mem. 4.) Aguilar held that the burden-of-proof allocations
prescribed by Congress for civil forfeitures before the
Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub.
L. No. 106-185, 114 Stat. 202 (2000), are constitutional.[12]

---

[11] Specifically, the NSPA authorizes fines and/or a term of
imprisonment to "[w]hoever transports, transmits, or
transfers in interstate or foreign commerce any goods,
wares, merchandise, securities or money, of the value of
$5,000 or more, knowing the same to have been stolen,
converted, or taken by fraud."

[12] CAFRA raised the Government's initial burden of proof in
civil forfeiture actions from probable cause to a
preponderance of the evidence. In Wally III, the Museum
argued that CAFRA thus heightened the Government's burden

(cont'd on next page)

337 F.3d at 233. Under the pre-CAFRA framework, the

Government can seize property upon a showing of probable

cause. Aguilar, 337 F.3d at 230; see also 19 U.S.C. § 1615

(requiring that probable cause, "to be judged of by the

court," be shown in order to institute civil forfeiture

action.) To meet this burden, the Government must show

"reasonable grounds, rising above the level of mere

suspicion" to believe the property is subject to

forfeiture. See United States v. An Antique Platter of

Gold, 991 F. Supp. 222, 228 (S.D.N.Y. 1997) (applying

probable cause standard to civil forfeiture action under

NSPA)(quoting United States v. One Parcel of Property

Located at 15 Black Ledge Drive, Marlborough, Conn., 897

F.2d 97, 101 (2d Cir. 1990)). Once the Government has made

this showing, the burden shifts to the claimant to show, by

a preponderance of the evidence, that the property is not

subject to forfeiture. Aguilar, 337 F.3d at 230; Antique

Platter, 991 F. Supp. 222 at 228; see also 19 U.S.C.

§ 1615. If the claimant meets this burden, "the government

must provide evidence of its own to the contrary that is at

---

(cont'd from previous page)

of pleading and proof in this action. Judge Mukasey
rejected this argument, holding that "CAFRA does not apply
to forfeiture proceedings commenced before August 23,
2000." Wally III, 2002 WL 553532, at *13.

least as persuasive and credible." Aguilar, 337 F.3d at
232.

The Museum argues that, under Aguilar, "the Government
in this case . . . must come forward with admissible
evidence to prove its forfeiture claim." (LM Opp. Mem. 4.)
However, this is not necessarily so. It is well-settled
that in the pre-CAFRA context, the Government may use
hearsay evidence to make its threshold showing of probable
cause. See Aguilar, 337 F.3d at 236 ("[T]here is clear
authority in our circuit allowing the use of hearsay to
establish probable cause." (citing United States v.
Daccarett, 6 F.3d 37, 56 (2d Cir. 1993))). Should the
Government establish probable cause to believe Wally is
forfeit, the burden shifts to the Museum to prove
otherwise, and the Government need provide admissible
evidence only after the Museum has met that burden. See id.
at 232.

The Museum relies on the Aguilar court's statement
that "when a claimant presents evidence that the property
was not connected to [the crime at issue], the government
must provide evidence of its own to the contrary that is at
least as persuasive and credible." Id. However, the
preceding sentence from Aguilar clarifies that such an
obligation is imposed on the Government, assuming it has

42

made a threshold showing of probable cause, only after the Museum shows by a preponderance that Wally is not subject to forfeiture: "under pre-CAFRA procedures a claimant may recover his property by proving by a preponderance of the evidence that the property was not used to facilitate the [crime at issue]." Id. This same language directly contradicts the Museum's suggestion at oral argument that it should be held to a lesser burden than preponderance of the evidence should the Government show probable cause to believe Wally forfeit. (Oral Argument Tr., 4:3-7:1, Sept. 21, 2009 ("O/A Tr.").)

## ii. Analysis

To prove Wally is subject to forfeiture, the Government must first show probable cause to believe that (1) the Museum imported Wally, (2) Wally was stolen, and (3) the Museum knew Wally was stolen when it shipped the Painting to the MOMA. To establish that Wally was stolen when imported, the Government must show that (a) Welz stole the Painting from Bondi and (b) it remained stolen when shipped to this country. See Wally III, 2002 WL 553532, at *16 ("To state a violation of [the NSPA] in this case, the government must allege not only that Welz stole the painting but also that the painting remained stolen at the

43

time it was imported in 1997."). I conclude that while

there is no genuine dispute over whether the Museum

imported Wally and whether the Painting was stolen, trial

is warranted to determine whether the Museum knew Wally was

stolen.

### 1. The Museum Aided and Abetted the Importation of Wally

The Museum briefly argues that the MOMA, not the

Museum, imported Wally. (LM Reply Mem. 32.) Under this

logic, even if all of the Government's other allegations

are true, the Painting was not imported by someone with

knowledge that it was stolen and therefore it is not

forfeit. However, it is undisputed that Dr. Leopold, the

Museum's museological director for life, signed the 1997

Agreement pursuant to which the Museum's Schiele collection

was brought into the United States. (Joint 56.1 Stmt.

¶ 134.) The agreement provided that the MOMA would arrange

transportation "by mutual agreement with, and with the

consent of, the [Museum]." (RL Decl. Ex. T at LM 2059.)

The Government has thus shown probable cause to believe the

Museum and the MOMA jointly imported Wally, and the Museum

offers no evidence indicating otherwise. Furthermore, if

the Museum knew that Wally was stolen when it agreed to

have the MOMA arrange the painting's transportation into
the United States, it is liable for Wally's importation in
violation of the NSPA even if the MOMA lacked this
knowledge. See, e.g., United States v. Giles, 300 U.S. 41,
48-49 (1937) (defendant's use of innocent intermediary did
not insulate him from conviction for falsifying bank
records).

### 2.    Welz Stole *Wally*

The Museum next contends that the Government has not
met its burden of showing that Welz stole Wally from Bondi.
While the NSPA does not define "stolen," the Court of
Appeals has held that the term should be broadly construed
to encompass "'all felonious takings . . . with intent to
deprive the owner of the rights and benefits of ownership,
regardless of whether or not the theft constitutes common-
law larceny.'" United States v. Long Cove Seafood, Inc.,
582 F.2d 159, 163 (2d Cir. 1978) (quoting United States v.
Turley, 352 U.S. 407, 417 (1957)).  Its meaning does not
depend on "the archaic distinctions between larceny by
trespass, larceny by trick, embezzlement and obtaining
properly by false pretenses." Id. (citing United States v.
Benson, 548 F.2d 42, 44-46 (2d. Cir. 1977)).  Rather,
determination of whether property is "stolen" in the NSPA

context depends on "whether there has been some sort of interference with a property interest." (Id.) An item is stolen if it "belonged to someone who did not . . . consent" to its being taken. United States v. Schultz, 333 F.3d 393, 399 (2d Cir. 2003).

Here, it is undisputed that Wally "belonged to" Bondi. The 1930 Kallir Catalogue reflects her as its most recent owner, and no subsequent catalogue identified by either party, including those authored by Leopold himself, includes Welz as one of Wally's rightful possessors. However, the parties dispute whether Bondi voluntarily surrendered the Painting to Welz. The Government contends that Welz wrongfully demanded Wally from Bondi when he visited her apartment on the eve of her escape to England in 1939. The Museum argues that Bondi sold Wally to Welz in 1938 as part of the Würthle Gallery. For the reasons below, I find that the Government has shown probable cause to believe the Painting was stolen, and no reasonable juror could find the Museum has introduced a preponderance of the evidence indicating otherwise.

### a. The Government's Evidence

The Government's evidence consists primarily of Bondi's written statements; the Partial Decision rendered

by the Austrian Restitution Commission in Bondi's action to
recover the Würthle Gallery; and the undisputed fact that
Welz was a Nazi and Bondi, as a Jew hoping to escape the
unspeakable fate of so many who died in the Holocaust,
could not refuse to comply with his wishes.  The Government
cites the following written statements by Bondi to show
that Welz took Wally without her consent:  (1) an October
3, 1957 letter from Bondi to Hunna; (2) a May 16, 1965
letter from Bondi to Kallir; (3) an August 22, 1966 letter
from Bondi to Kallir; and (4) an unsigned, undated
statement attributed to Bondi and discovered long after her
death (the "Bondi Statement"). (Joint 56.1 Stmt. ¶¶ 17-20.)
In the first two letters, Bondi recites that Wally was
never part of her gallery and that Welz took the Painting
from her apartment. (3/10/08 Levin Decl. Ex. 12 at JK
000053-54, JK 000057-58.)  Bondi's May, 16, 1965 letter to
Kallir also states that Welz gave her no compensation for
the Painting. (Id. Ex. 12 at JK 000057-58.)  The remaining
two written statements offered by the Government assert
that Welz came to Bondi's apartment, saw the Painting on
her wall, and demanded she hand it over notwithstanding her
objections that it was not part of her gallery and thus had
not been included in the gallery's sale. (Id. Ex. 12 at LB
002290-91; Ex. 14 at US 000156.).  Both of these documents

state that, at the behest of her husband, Bondi ultimately surrendered the Painting because she was afraid Welz would prevent them from leaving the country. (Id. Ex. 12 at LB 002290-91; Ex. 14 at US 000156.)

To further support its view that Welz stole Wally, the Government cites purported references to the Painting in both the post-war Restitution Commission's Partial Decision regarding Bondi's claim to the Würthle Gallery and her response to Welz's appeal thereof. In its Partial Decision, the Commission remarked that Welz had wrongfully "demanded a Biedermeier table and a Schiele from [Bondi]." (Id. Ex. 11 at LM 1661 (quotation marks omitted).) In her response to Welz's appeal of that decision, Bondi asserted that Welz, "without any consideration, demand[ed] objects from [her] private assets." (3/10/08 Goldblatt Decl. Ex. 7 at LB 000876-85; Joint Mem. 12.)

Finally, to reinforce the Bondi Letters and Bondi Statement insofar as they state that Bondi kept Wally separate from her gallery, the Government offers a 1925-26 Würthle Gallery Exhibition catalogue listing the Painting's owner as "Privately owned L.B." (3/10/08 Levin Decl. Ex. 13 at LB 002260), as well as a 1928 catalogue listing two Schiele paintings as belonging to the Würthle Gallery and

<u>Wally</u> as belonging to "Lea Bondi, Vienna" (<u>id.</u> at LB
002269-70).

### b. The Museum's Evidentiary Objections

The Museum asserts that the letters and Bondi's
unsigned statement are unauthenticated, unreliable, and
inadmissible hearsay. Even if this were so, as observed
<u>supra</u> in Part II(B)(i), the Government may use inadmissible
evidence to meet its initial burden of showing probable
cause. <u>See</u> <u>Aguilar</u>, 337 F.3d at 236. Furthermore, as
detailed below, the Museum's evidentiary objections are
without merit because (1) the Government has established
the authenticity of these documents pursuant to Federal
Rule of Evidence 901(a), b(1), and b(8) through the
testimony of the documents' custodians, (2) any objections
to the trustworthiness of these documents go to their
weight, not their admissibility, and (3) the documents fit
within the ancient documents exception to the hearsay rule
provided in Federal Rule of Evidence 803(16).

Authentication, or the provision of "evidence
sufficient to support a finding that the matter in question
is what its proponent claims," is a prerequisite to
admissibility. Fed. R. Evid. 901(a). A showing of
authenticity is sufficient if "a reasonable juror could

49

find in favor of authenticity or identification." United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004). Authenticity may be established in a number of ways, including through testimony of a witness with knowledge of the proffered item, see Fed. R. Evid. 901(b)(1), or, in the case of ancient documents, with evidence that the offered material "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered," Fed. R. Evid. 901(b)(8).

All of the Bondi letters at issue have been sufficiently authenticated by the deposition testimony of Jane Kallir (Otto Kallir's granddaughter) and Hildegard Bachert. Jane Kallir began working for her grandfather at the Gallery St. Etienne in 1977. (3/10/08 Levin Decl. Ex. 6, Kallir Dep. 8:24-9:3, Aug. 9, 2004.) She testified that the letters came from a folder containing Kallir's correspondence with Bondi which was drawn from a larger Bondi file kept at the Gallery St. Etienne in 1984. (Id. at 67:16-68:22; 85:7-11.) She further testified that the larger Bondi file from which the folder was drawn had been maintained at the Gallery since before she began working there. (Id. at 201:20-25.) Bachert was Kallir's secretary

from 1940 to 1978, during which time she maintained his files. (5/14/09 Levin Decl., Ex. 3, Bachert Dep. 8:22-24, 10:6-18, 14:5-7, Sept. 19, 2007.) She set up a file for Bondi documents and correspondence, which she read because she was interested in the story, and helped create the folder in which the Bondi letters were located. (Id. at 57:19-58:9, 59:5-11, 60:17-61:17, 63:10-64:24, 81:7-15; 108:14-16.)

This testimony is sufficient to show that the letters are in fact what they purport to be. They are admissible under 901(b)(1) insofar as Bachert and Kallir testified that they were part of the Gallery St. Etienne's records. See 5 Jack B. Weinstein & Margaret Berger, Weinstein's Federal Evidence, § 901.03[2] (2d ed. 2009). The letters are also authenticated under Rule 901(b)(8) in that (1) there is no allegation that they have been tampered with or otherwise altered so as to give reason to doubt their authenticity, (2) they were found in a place, namely Kallir's Gallery's files, where authentic Bondi correspondence would likely be stored, and (3) they are more than 20 years old. See Arasimowicz v. Bestfoods, Inc., 81 F. Supp. 2d 526, 529-30 (S.D.N.Y. 2000); Walker v. 300 S. Main, LLC, No. 2:05-CV-442, 2007 WL 3088097, at *1-2 (D. Utah Oct. 22, 2007) (original documents that had been in

the plaintiff's files for over 40 years satisfied the authentication requirements of Rule 901(b)(8)).

While it presents a closer question, the Government has also made an adequate prima facie showing of the Bondi Statement's authenticity under Rule 901(b)(8). At his deposition, Gideon Southwell, Bondi's great-great nephew, testified that he found this typewritten, unsigned, undated, and admittedly incomplete one-page document in a Biedermeier bureau located at the 2 Lambolle Road residence that had belonged to Bondi and was used by his grandmother, Margaret Fisher, after Bondi died. (3/10/08 Levin Decl. Ex. 7, Southwell Dep. 71:6-20, 82:12-20, Feb. 7, 2007.) Southwell testified that the document was typed on Bondi's "L.B.J." letterhead, with which he was familiar. (See id. at 175:11-21). He further testified that he had lived in the 2 Lambolle Road residence for several years in the late 80's and early 90's and that Bondi's belongings remained there long after her death in 1969. (Id. at 68:23-69:8.) Sometime between 1987 and 1990, when he was helping his grandmother "tidy the bureau," he discovered the Bondi Statement, along with other papers belonging to his grandmother and to Bondi, "in the lower drawer of the two main drawers" of the bureau. (Id. at 70:12-23, 71:25-72:11, 73:20-23.)

Although it is unsigned and undated, the Government
has sufficiently shown that the Bondi Statement is what it
purports to be. First, the appearance of this document
does not raise a contrary suspicion. It contains a first-
person narrative in English typed on Bondi's personal
letterhead, using a typeface similar to that used by Bondi
in other correspondence with Kallir, some of which she
wrote in English. (See 5/14/09 Levin Decl. Ex. 5 at LM
2252; 3/10/08 Levin Decl. Ex. 12 at JK 000045-46, JK
000051-52, JK 000053-54, JK 000057-58.) As further
detailed below, the narrative substantially reiterates
assertions made elsewhere in Bondi's correspondence.[13]
Second, the document was found in a likely place – namely a
bureau used by Bondi at her residence in London. Finally,
Southwell's testimony provides a reasonable basis for
concluding that the document is more than twenty years old.

The Museum's assertions that the Bondi letters and
Statement are not credible and that some of them appear to
be incomplete, even if true, do not preclude a finding of
authenticity for purposes of this motion. As the
Government correctly observes, these arguments go to the

_____

[13] There is however, an assertion in the Bondi Statement
that is not repeated elsewhere, specifically the statement
that Bondi visited the Belvedere and laid claim to Wally
after the war. (3/10/08 Levin Decl. Ex. 14 at 000156); see
infra n. 14.

weight of the evidence rather than its admissibility. See 5
Weinstein's Federal Evidence § 901.11[2] ("Any question
about the credibility of [an ancient] document's contents
goes to the weight the trier of fact chooses to accord to
the document, not to its admissibility."); Threadgill v.
Armstrong World Indus., 928 F.2d 1366, 1375-76 (3d Cir.
1991) ("[T]he point of a Rule 901(b)(8) inquiry is to
determine whether the documents in question are, in fact,
what they appear to be. . . . Questions as to the
documents' content and completeness bear upon the weight to
be accorded the evidence and do not affect the threshold
question of authenticity." (quotation marks and citation
omitted)).

Furthermore, the only real inconsistency observed by
the Museum is that two of Bondi's letters and the Bondi
Statement indicate that Bondi surrendered Wally in 1938,
whereas only her August 22, 1966 letter to Kallir indicates
that the transfer took place in 1939.[14]  These materials are

---

[14] Bondi's October 3, 1957 letter to Hunna and a letter she
wrote to Kallir on March 14, 1958 indicate that the
transfer occurred in 1938. (3/10/08 Levin Decl. Ex. 12 at
JK 000053-54; Barron Decl. Ex. D at JK 000997-98.)  The
Bondi Statement also indicates that Welz took Wally "one
day before I left the Gallery," which Welz took over in
1938. (3/10/08 Levin Decl. Ex. 14 at 000156.)  Only Bondi's
August 22, 1966 letter to Kallir states that Welz demanded
Wally immediately immediately before she fled Vienna in

(cont'd on next page)

otherwise fairly consistent. As discussed above, they all state that Wally was Bondi's private property and that Welz came to her apartment and took it from her. These allegations are supported by the Partial Decision of the Restitution commission and Bondi's response to Welz's appeal therefrom. Furthermore, all the letters at issue, as well as the Bondi Statement, recount the undisputed fact that Bondi met Dr. Leopold in London after the War, when she asked him to help her recover Wally.

Having established that the Bondi letters and Statement have been adequately authenticated, the Museum's hearsay objection need not detain us long. Rule 803(16) provides a hearsay exception for ancient documents. A document falls within this exception where, as here, it meets the authenticity requirements of Rule 901(b)(8). See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 643 (2d Cir. 2004) (letters authenticated as ancient documents

(cont'd from previous page)

1939 (Id. Ex. 12 at LB 002290-91), although, like her 1966 letter to Kallir, the the Bondi Statement asserts that she surrendered Wally at her husband's urging "in order not to impair our departure, under duress" (id. Ex. 14 at 000156.) As detailed below, the Museum uses this inconsistency as a basis for its assertion that Bondi sold Wally to Welz along with her gallery. I note, however, that the Museum cannot reasonably use these documents to make its case and simultaneously dispute their admissibility.

55

excepted from hearsay); George v. Celotex Corp. 914 F.2d
26, 30 (2d Cir. 1990) (affirming admission of document
authenticated as ancient document under hearsay exception);
5 Weinstein's Federal Evidence § 803.18 ("[I]f a document
meets the requirements for authentication under Rule 901,
statements in it are excepted from the hearsay rule by Rule
803(16).").

c.    The Government Has Met Its
Threshold Burden

In Wally III, Judge Mukasey found that Welz stole
Wally within the meaning of the NSPA if he "demanded the
[P]ainting from Bondi in the face of a claim that it was
part of her private collection and thus unconnected to
Welz's Aryanization of her gallery." 2002 WL 553532 at *16.
Viewing the Government's documentary evidence, which
consists of letters, the Bondi Statement, documents from
Bondi's post-war restitution proceedings, and catalogues
showing that Wally was not part of the Würthle Gallery,
against the historical backdrop of the Anschluss, I
conclude that there are ample grounds to believe that this
indeed occurred.   Therefore, the Government has met its
threshold burden of showing probable cause to believe Welz

stole Wally from Bondi by demanding it from her at a time
when she could not refuse.

### d.    The Museum Has Not Met Its Burden

The burden thus shifts to the Museum to show, by a
preponderance of the evidence, that Welz did not steal
Wally.  The Museum contends that Bondi fabricated "a
dramatic 1939 transfer" of Wally to Welz when in reality
she sold it as part of the Würthle Gallery more than a year
before she left for England. (LM Opp. Mem. 14.)  The crux
of this argument, as explained by Judge Mukasey in Wally
III, is that Wally cannot have been stolen because "Welz
acquired [Wally] in connection with his Aryanization of the
gallery, which, although repugnant, was legal at the time."
Wally III, 2002 WL 553532, at *16.  To support this
contention, the Museum offers (1) an entry in an accounting
report of Welz's business conducted by unknown government
officials in 1943 (before the allied invasion of Europe)
indicating that Welz paid 200 Reichmarks for Wally, (2) an
October 31, 1966 letter from Kallir purportedly showing
that Welz "bought" the Painting, (3) documents from Bondi's
restitution proceedings indicating that Bondi sold her
Gallery to Welz, (4) a December 6, 1957 letter from Hunna
to Bondi stating that she had "entrusted" Wally to Welz,

and (5) documents indicating that Welz acquired Wally in 1938 rather than 1939.

These are insufficient to carry the Museum's burden. First, the anonymous accounting entry is the only evidence in the entire record directly supporting the notion that Welz paid anything for Wally. The entry reads "4 Egon Schiele Vally v. Krumau [acquired] Lea Jaray, Vienna, according to letter of March 24, 1939 [for Reichmarks 200]. (Barron Decl. Ex. C at LB 000579.) The letter to which this entry refers has not been found in any archives. (Joint Counter 56.1 Stmt. ¶ 5.)[15] Even if admissible, this uncorroborated entry, prepared by an unknown individual years after the event in question, is insufficient to counter Bondi's multiple written statements indicating she was not paid for the Painting and the Restitution Commission's acknowledgement that Welz had improperly

---

[15] The Government objects to consideration of this entry as inadmissible hearsay and unsupported by personal knowledge insofar as it is not known who prepared the report. (Joint Counter 56.1 Stmt. ¶ 5.) It also asserts that it comes from a tax audit of Welz's business "prepared for . . . government officials of the Third Reich," and is therefore of dubious evidentiary value. (O/A Tr. 55:24-56:3.) I need not resolve this issue because, as discussed below, even if it were admissible, the entry is insufficient to carry the Museum's burden of proof and the Museum's remaining evidentiary arguments are without merit. As the Museum admitted at oral argument, this document is not "a case winner by any means." (O/A Tr. 55:9-10.)

"demanded a Biedermeier table and a Schiele from [Bondi].
(3/10/08 Levin Decl. Ex. 11 at LM 1661.)

Furthermore, the October 31, 1966 letter from Kallir
to Bondi does not indicate that Welz paid for Wally but
rather undermines any such contention. The Museum
highlights the following language: "You wrote that . . .
the painting was first 'bought' by Welz from you against
your will." (Barron Decl. Ex. D at JK 000044.)[16]  The Museum
argues that Kallir's use of "[t]he word 'bought' clearly
indicates, whether rightly or wrongly, under pressure or
otherwise, or as part of an Aryanization, Welz paid for the
painting."[17] (O/A Tr. 72:14-17.)  Setting aside for a moment
the undisputed fact that this statement came from a man
with absolutely no first-hand knowledge of the incident
that took place at Bondi's apartment nearly twenty years
earlier, the cited passage clearly contradicts the Museum's
interpretation.  That Kallir put the word "bought" in
quotes indicates that he either suspected or had been told

---

[16] The Government objects to consideration of this letter as
inadmissible hearsay and because the statement upon which
the Museum relies was made without personal knowledge. (O/A
Tr. 91:24-92:1.)  I need not rule on the letter's
admissibility because this document only reinforces the
Court's ultimate conclusion that the Museum has not shown
that Welz did not steal Wally.

[17] Thus, even the Museum shies away from explicitly
asserting that the letter proves Wally was Aryanized along
with Bondi's gallery.

otherwise, and the remainder of the sentence clearly indicates that Welz took Wally "against [Bondi's] will." (Barron Decl. Ex. D at JK 000044.) Thus, Kallir's October 31, 1966 letter tends to strengthen the Government's case rather than the Museum's and does nothing to controvert the Government's showing that Welz stole Wally.

The Museum's reliance on documents from Bondi's restitution proceedings, first offered for the first time at oral argument rather than addressed in its exhaustive briefing, is also misplaced. These documents consist of (1) the July 29, 1949 testimony on Welz's behalf of Luise Kremlacek, who worked at the Würthle Gallery for Bondi and then Welz; (2) a December 4, 1947 letter from Hunna to the Vienna Police headquarters; and (3) the August 25, 1949 testimony of Engineer Karl Gerstmayer, Welz's cousin who evidently worked for him at the gallery and about whom the Museum has submitted no further information. (Leopold Museum Foundation Letter and Documents in Response to this Court's Order dated September 16, 2009 ("LM O/A Binder") Exs. 11-13.) The Museum asserts that because all of these documents say that Welz did not coerce Bondi into selling her gallery, he cannot have stolen Wally. (See LM O/A Binder Ex. 11 at LB001014 ("This business was taken over by the accused from [Bondi] in the best mutual consent."); Ex.

12 at LB000805 ("According to my information to date, Mr.
Friedrich Welz exerted no direct personal coercion on Mrs.
Jaray in executing the sales contract."); Ex. 13 at
LB001022 (Bondi "placed great importance on turning over
[her gallery] to Friedrich Welz, not only because of the
many years of doing business with one another, but above
all because she knew that Welz had the same artistic
intentions (advocate of modern paintings).").)  Assuming
without deciding that these documents are otherwise
admissible, they are irrelevant insofar as they discuss
only Bondi's sale of her gallery, the Aryanization of which
is undisputed, and say absolutely nothing about Wally.
Furthermore, like Kallir's October 31, 1966 letter
discussed above, these documents do nothing to controvert
Bondi's explicit and repeated statements that Welz came to
her apartment and took Wally, which was never part of her
gallery, against her will.

    Nor does the Hunna letter alter this analysis.  There,
Hunna states that he is "of the opinion that Dr. Leopold is
obligated to hand over the picture" and pursue a claim
against the Belvedere for its purchase price. (Barron Decl.
Ex. D at JK 000027).  "The prerequisite for all this",
wrote Hunna, "is that the heirs of Dr. Reiger actually did
receive the Picture 'Vally' erroneously and [that it] was

61

not sold to them by Welz (to whom you somehow entrusted it) or [they] received it in an exchange etc." (Id.) The Museum seizes on the word "entrusted" as indicating that Bondi voluntarily surrendered Wally. (LM Opp. Mem. 16.) This tortured reading is belied by the letter's recommendation that Bondi sue Leopold for the Painting because it belonged to her rather than Welz or anyone else. Furthermore, Hunna had no personal knowledge of the event in question, and his curious phrasing in one letter does not amount to a preponderance of the evidence sufficient to match that offered by the Government.

Finally, the Museum contends that chronological inconsistencies in Bondi's correspondence and the Bondi Statement support the conclusion that she sold Wally along with the Würthle Gallery. (LM Opp. Mem. 13-16.) The Museum observes that both Bondi's October 3, 1957 letter to Hunna and her March 14, 1958 letter to Kallir indicate that Welz took Wally from her in 1938 rather than 1939. (See id.). If the transfer took place in 1938, the argument goes, not only does it undermine the narrative contained in Bondi's August 22, 1966 letter to Kallir, which states that Welz took Wally immediately before she and her husband fled to England in 1939 (and which, the Museum argues, was prepared with an eye towards litigation and is thus incredible), but

it also indicates that she sold the Painting as part of the Würthle Gallery because both transactions occurred in 1938.

This diversionary argument is fundamentally flawed not only because it is purely speculative but also because Bondi's statements consistently indicate that Welz stole Wally. As noted above, all of her letters, as well as the Bondi Statement, indicate that Welz took Wally from Bondi's apartment after she told him that it was her private property apart from the Würthle Gallery. That the incident may have occurred in 1938 rather than 1939 is immaterial. See Wally III, 2002 WL 553532, at *16 (Welz stole Wally if he "demanded the painting from Bondi in the face of a claim that it was part of her private collection and thus unconnected to [his] Aryanization of her gallery.").

In sum, no reasonable trier of fact could find that the Museum has met its evidentiary burden of showing by a preponderance of the evidence that Welz did not steal Wally. To the contrary, most of the admissible evidence contradicts the Museum's assertion that Bondi sold Wally as part of the Würthle Gallery and supports the Government's position that he took the Painting against her will.

### 3. *Wally* Remained Stolen

This finding does not, however, end the inquiry. The Government must also show that Wally remained stolen at the time the Museum shipped it to the United States in 1997. Wally III, 2002 WL 553532, at *16; Antique Platter, 991 F. Supp. at 232. The Museum argues that under both United States and Austrian law, even if Welz stole Wally, the Painting was longer stolen by the time the Museum acquired it. As explained below, these arguments are unavailing.

### a. The Recovery Doctrine

First, the Museum argues, as it did in Wally I and Wally III, that even if Welz stole Wally, the Painting ceased to be stolen by operation of law when United States forces recovered it after World War II. Under the recovery doctrine, derived from English common law, "one cannot be convicted of receiving stolen goods if, before the stolen goods reached the receiver, the goods had been recovered by their owner or his agent, including the police." United States v. Muzii, 676 F.2d 919, 923 (2d Cir. 1982). The doctrine is rooted in agency principles, which imply a principal-agent relationship where government officials are deemed to act on the owner's behalf "because they are charged by law with doing so." Wally I, 105 F. Supp. 2d at

293 ("It seems obvious that stolen property, recaptured by the police, no longer has the status of stolen goods but, rather, is held by the police in trust for, or for the account of, the owner."); see United States v. Johnson, 767 F.2d 1259, 1267 n.7 (8th Cir. 1985).

In Wally I, Judge Mukasey relied on the recovery doctrine in dismissing the Government's Second Amended Verified Complaint because the Government's allegations implied that United States Forces "were charged with recovering stolen items and acting on behalf of the items' true owners" and therefore Wally ceased to be stolen when it came into the RDR's possession.[18] 105 F. Supp. 2d at 294. However, after allowing the Government to amend its complaint in Wally II, Judge Mukasey found in Wally III that the recovery doctrine no longer barred this action. 2002 WL 553532, at *14. In its Third Amended Verified Complaint, the Government "retracted the allegation that the United States armed forces were holding stolen works of

---

[18] This ruling was predicated on the following passage from the Second Amended Verified Complaint:

> The task of the United States Forces in Austria with respect to art restitution at that time was to sort such artworks and return them to the countries from which they had been seized, in order for those countries to return them to their rightful owners.

(Second Am. V. Compl. ¶ 5(g).)

65

art with an eye toward their eventual restitution, which .
. . formed the predicate of the implied agency." Id. at
\*15. Specifically, the [Third] Complaint alleges that,
under Military Decree Number 3, "the allied forces seized
all of the property of suspected war criminals, regardless
of whether it was stolen, Aryanized, or legitimately
acquired." Id. Additionally, United States Forces had no
legal duty to return seized property to its true owner but
rather were required "merely to sort all seized property
and transfer it to the BDA." Id. Accordingly, Judge
Mukasey held that "[t]his lack of both knowledge and duty
makes this case unlike every other case cited to the court
that applied the recovery doctrine to the police or other
implied agents. It negates the existence of the requisite
agency relationship." Id.

Similar logic precluded any finding of implied agency
between Bondi and the BDA because "like the armed forces,
the BDA did not know Wally was stolen." Id. Furthermore,
"the BDA had divided loyalties because it was also
responsible for deciding whether owners of cultural assets
should be permitted to export them from Austria. . . .
[The BDA] often sought to keep certain works in Austria and
place them in Austrian museums." Id. at \*15.

The Museum now argues that the evidence supports the Government's original allegations and, as in Wally I, compels re-application of the recovery doctrine to Wally. (LM Mem. 7-12.) The Government has shown probable cause to believe otherwise. As the Museum concedes in its moving brief, "'[t]he point of the Recovery Doctrine rests on the agent's knowledge that stolen property has been recovered." (LM Mem. at 11 (quoting Wally III, 2002 WL 553532, at *15).) The Government has provided ample evidence that United States forces did not know Wally was stolen when they seized it. After World War II, the United States military seized millions of items of property pursuant to military decrees governing its operations. (3/10/08 Levin Decl. Ex. 8, Adams Dep. 56:17-57:9, Mar. 28, 2007; Joint 56.1 Stmt. ¶ 27). As Judge Mukasey observed, these decrees authorized seizure of all property of persons, like Welz, who were detained by the military, regardless of whether such property was stolen. See Wally III, 2002 WL 553532, at *15; (Joint 56.1 Stmt. ¶ 27). All artworks confiscated in this fashion were then transferred to their countries of origin. (See Adams Dep. 55:19-56:4; Joint 56.1 Stmt. ¶ 29.) The sheer volume of such seizures provides ample reason to doubt that United States forces had any real knowledge of Wally's history. Nor is there any indication that the BDA

knew Wally was stolen, and, as Judge Mukasey noted, even if
it had, it cannot be deemed to have been Bondi's agent due
to "divided loyalties." Wally III, 2002 WL 553532, at *15;
(see 3/10/08 Levin Decl. Ex. 20, Declaration of Dr. Peter
Lambert sworn to 3/17/00 ("3/17/00 Lambert Decl."), ¶ 32).

For its part, the Museum has submitted virtually no
evidence, much less a preponderance, to support a finding
that either United States Forces or the BDA knew Wally was
stolen. It principally relies on the following language
from the 1947 Receipt and Agreement, describing the
artworks delivered by the RDR to the BDA (among which
Wally, although not specifically listed, was apparently
included):

> Paintings purchased during the war by Frederic
> Wels, Salzburg, from the confiscated collection
> of Dr. Heinrich Reiger (deceased) former Jew of
> Vienna, and recovered from his collection in
> Salzburg.

(LM Mem. 11; 3/10/08 Levin Decl. Ex. 11 at LM 0213.) Yet
the Museum does not explain how this language supports its
theory. Quite to the contrary, as the Government observes,
the paintings are described as having been "purchased"
rather than wrongfully taken. (Joint Opp. Mem. 10-11.)
Even assuming the RDR and BDA knew these paintings were
wrongfully taken because they belonged to a Jew killed in

the holocaust, there is no indication in the above language
(or indeed in any of the alleged facts) that the Rieger
collection had not been Aryanized and thus, according to
the Museum's own logic (at least when addressing the issue
of whether Welz stole Wally in the first place), never
stolen.  The Museum cannot have it both ways: it cannot
credibly maintain that Wally was not stolen and
simultaneously assert that the RDR and BDA knew it was.
The cases relied on by the Museum to support application of
the recovery doctrine here are thus inapposite because they
address situations in which the governmental agency that
purportedly recovered once-stolen property knew it had been
stolen. See Muzii, 676 F.2d 919; United States v.
Warshawsky, 818 F. Supp. 181 (E.D. Mich. 1993), aff'd in
part, rev'd in part, 20 F.3d 204 (6th Cir. 1994).

Even assuming arguendo that the RDR and the BDA knew
Wally was stolen, there is no evidence that either was
under a legally enforceable duty to return the Painting to
Bondi. Cf. Wally I, 105 F. Supp. 2d at 293 (stating that
the doctrine applies to goods recovered by government
officials "charged by law" with acting on the owner's
behalf.)  The Museum relies on language from the Receipt
and Agreement indicating that the "items described in
Schedule 'A' . . . will be returned to their lawful

owners." (3/10/08 Levin Decl. Ex. 11 at LM 0211.) However, the attached schedule does not list Wally but rather "His Wife's Portrait." (Id. at LM 0213.) Also, with respect to the BDA at least, the Government has shown (and the Museum has offered no evidence to rebut) that its primary interest was in keeping Austrian cultural objects in Austria rather than in restitution. (See 3/17/00 Lambert Decl. ¶ 32.)

Finally, even interpreting the evidence as the Museum does, it is unclear how either the RDR or the BDA could be deemed to have acted as Bondi's agent. The Museum asserts that Wally's transfer was prompted by lawyers for the Rieger heirs, who sought restitution of their client's interests, not Bondi's. (LM Mem. 12.) Accordingly, I see no reason to disturb Judge Mukasey's finding in Wally III that the recovery doctrine is inapposite here.[19]

### b. Bondi's Restitution Proceedings

The Museum next contends that even if Welz stole Wally, the Painting ceased to be stolen when Bondi settled the claims she brought against him before the Restitution Commission and thus regained her gallery. This argument

---

[19] I further note that even if the recovery doctrine did apply here, it would not bar the Government's forfeiture claim predicated on the theory that Dr. Leopold criminally converted Wally.

turns on whether Bondi sought to recover Wally during those restitution proceedings, the precise contours of which are unknown. (LM Counter 56.1 Stmt. ¶ 34.) The Government has shown probable cause to believe she did not by (1) offering Bondi's correspondence, the Bondi Statement, and two catalogues described in Part II(B)(ii)(2)(a) supra, all of which indicate that Wally was never part of the Würthle Gallery; and (2) observing that, although it mentions Welz's reprehensible behavior with respect to "a Biedermeier table and a Schiele," the Restitution Commission's Partial Decision orders only that the Würthle Gallery be returned to Bondi and that Welz provide an accounting of the gallery's revenues since April 1, 1938. (3/10/08 Levin Decl. Ex. 11 at LM 1661-62 (quotation marks omitted).)

The burden thus shifts to the Museum to show that Bondi did in fact claim Wally in her restitution proceedings. To this end, the Museum relies on a declaration of its Austrian law expert, Dr. Peter Konwitschka, who asserts that Bondi could have claimed Wally in that proceeding. (Second Konwitschka Decl. ¶ 16.) It then seizes on the Partial Decision's conclusion that Welz "did not always conduct himself in a fair and generous manner, e.g. . . . when he demanded a 'Biedermeier table

71

and a Schiele' from the Claimant," arguing this language indicates that she had in fact made such a claim. (3/10/08 Levin Decl. Ex. 11 at LM 1661; LM Opp. Mem. at 17.)

Such speculation hardly amounts to a preponderance of the evidence.[20]  That Bondi may have been able to claim Wally during her restitution proceedings does not mean she actually did so.  Furthermore, as the Government observes, the Partial Decision's reference to Welz's failure to "conduct himself in a fair and generous manner" with regard to "a Biedermier table and a Schiele" might well indicate that the Commission was distinguishing these items from property belonging to the Gallery and thus subject to appropriation under the Aryanization laws, in which case the reference to a Schiele would not necessarily imply that Bondi had submitted a separate claim for it in those same proceedings.

---

[20] Indeed, as the Museum admitted at oral argument, it has provided no evidence indicating that Wally was ever part of the Würthle Gallery. (O/A. Tr. 58:15-17.)  Furthermore, its assertion that "[n]or do we have any evidence to the contrary" (id. at 58:5-6) is flatly contradicted by Bondi's letters, as well as the 1928 catalogue offered by the Government expressly listing two Schiele paintings as belonging to the gallery and Wally as belonging to "Lea Bondi, Vienna" (3/10/08 Levin Decl. Ex. 13 at LB 002260, 002269-70).

c.   *Wally*'s Status as Stolen Under
Austrian Law

Finally, the Museum argues that Wally lost its stolen status by operation of Austrian law. Wally I and III established that "although federal law determines whether property has been stolen, local law 'controls the analytically prior issues of (a) whether any person or entity has a property interest in the item such that it can be stolen, and (b) whether the receiver of the item has a property interest in it.'" Wally III, 2002 WL 553532, at *16 (quoting Wally I, 105 F. Supp. 2d at 292). The Museum argues that in the years between the close of World War II and Wally's 1997 importation, either the Belvedere or Dr. Leopold acquired title to the Painting. This Court is obliged to resolve "[i]ssues involving the interpretation of foreign law . . . as a matter of law." Antique Platter, 991 F. Supp. at 231. For the reasons below, I conclude that the Museum's arguments must fail.

aa.   Prescriptive Possession by the
Belvedere

As it did in Wally III, the Museum argues that "the Belvedere probably had the requisite confidence to acquire title to [Wally]" by prescription and then transfer its

valid property interest to Dr. Leopold. (LM Opp. Mem. 19.)
Under the Austrian law, "a possessor of property may
acquire title to that property if the possession is based
on legal title (purchase or exchange) and extends
throughout the statutory period accompanied by the
possessor's belief that the possession is lawful." Wally
III, 2002 WL 553532, at *17.  However, a possessor lacks
the requisite confidence to acquire title by prescription
"if, at any time during the prescription period, the
possessor had any objective reason to doubt his claim, or
if he was negligent in maintaining his belief of lawful
possession." (Id.)  If the possessor has an objective
reason to doubt his ownership, he may regain confidence by
performing an investigation sufficient to remove any such
doubt, at which point the statutory period begins to run
anew. (Konwitschka Decl. ¶¶ 24-26, 61; Lambert Resp. Decl.
¶ 9.)

        The Government advances the same arguments it used in
Wally III for why the Belvedere never acquired title to the
Painting under Austrian law, now bolstered by evidentiary
citations.  It argues that: (1) the Belvedere did not
acquire Wally by purchase contract because the Painting had
been confused with a Schiele drawing called "Portrait of
His Wife" and mistakenly given to the Rieger heirs, who

therefore could not convey valid title (Joint Mem. 14

n.12)[22]; (2) the Belvedere had cause to suspect that Wally

---

[22] In this respect, the Government observes that the Rieger
Restitution Commission's May 31, 1948 Partial Finding
ordered Welz to restore 12 artworks, including a Schiele
"drawing" referred to as "Portrait of His Wife" (Joint 56.1
Stmt. ¶¶ 57-58; 3/10/08 Levin Decl. Ex. 11 at LM 1266-68,
1276-77.)  The Government also cites, inter alia,
Garrison's letter to Demus at the BDA enclosing a list of
paintings confiscated from Welz and describing item 573 as
"a portrait of a woman named Vally" (Joint 56.1 Stmt. ¶ 54
(undisputed)) and McKee's June 8, 1948 letter to the
Commanding General of United States forces, a copy of which
was sent to the BDA, indicating that further inquiry should
be made as to whether the "Portrait of His Wife" in the
inventory of Rieger artworks provided by the Rieger lawyers
was the same as Wally, which Welz had told him did not
depict Schiele's wife. (Joint 56.1 Stmt. ¶ 56).  The
Government also submits the declaration of one of the
Rieger heirs, Robert Rieger, saying that Wally was never
part of the Rieger collection. (3/10/08 Levin Decl. Ex. 12
at JK 000007.)  The Museum objects that the declaration is
inadmissible. (LM Opp. 11-12.)  However, as already
observed, the Government need not use admissible evidence
to make its threshold showing of probable cause.
Additionally, the statement has been authenticated by
Bachert as having come from the files of the Galerie St.
Etienne and is admissible as an ancient document under
Rules 901(b)(8) and 803(16).

did not belong to the Rieger heirs because when Garzarolli,
Balke, Novotny, and Broda's secretary inspected the works
restituted to the Rieger heirs to determine whether the
Belvedere should acquire them, they described Wally as
"Portrait of a Woman," while handwritten notes indicate
they knew it depicted "Wally Neuzil from Vienna" and no
painting matching this description had been restituted to
the Rieger heirs (Joint Mem. 17-18)[23]; and (3) as evidenced
by the Bondi Statement, Bondi visited the Belvedere and
claimed ownership of Wally, thereby providing an
independent objective reason for the Belvedere to doubt it
owned the Painting (Joint Mem. 20). At the very least,
Bondi's assertion in the Bondi Statement that she laid
claim to Wally at the Belvedere is sufficient to satisfy
the Government's threshold showing of probable cause to
believe the Belvedere lacked the requisite confidence to
acquire title to Wally by prescription. (See 3/10/08 Levin
Decl. Ex. 14 at 000156.)

The Museum has not met its burden of showing
otherwise. It argues that (1) since no title is written on

---

[23] In this regard, the Government further notes that the
Belvedere was the first to refer to "Portrait of a Woman"
rather than "Portrait of His Wife" as having been part of
the Rieger collection. The Government argues that in this
fashion "the Belvedere concealed the fact that Wally had
been wrongfully included among the works sent with the
Rieger collection." (Joint Mem. 18-21.)

76

Wally itself, it is of no moment that the Painting was

variously referred to as "Portrait of His Wife" or

"Portrait of a Woman" (LM Opp. Mem. 20-21); (2) the

Government has not shown that there ever was a "drawing"

called "Portrait of His Wife" and thus there is no reason

to suspect that this designation in the list of items

claimed by, and restituted to, the Rieger heirs was not

Wally (See LM Opp. Mem. 22); (3) Wally was properly

restituted to the Rieger heirs by the BDA as a result of

the restitution proceedings they brought against Welz (LM

Opp. Mem. 25); and (4) Bondi never laid claim to Wally (LM

Opp. Mem. 11).

The Museum cites two documents to support its first

three contentions.  The first is a March 28, 1950 letter

from Mueller (the Rieger heirs' lawyer) to Dr.

Blauensteiner (of the Belvedere) noting that, "according to

Dr. Rieger's list," item # 3 on the list of items he

claimed as part of the Rieger collection ("Portrait of His

Wife") "was in [Dr. Rieger's] possession before 1938."

(Barron Decl. Ex. B at 001747.) The second is a BDA record

dated March 31, 1950 which states that "[a]ccording to

information conveyed by phone by the law firm of Dr. Broda,

the picture listed under No. 3 'Schiele, Portrait of his

Wife' is also part of the collection of Dr. Rieger." (Id. Ex. B at 001946.)

However, in his letter, Mueller also expressly notes that "[a]s far as I know, it was determined at the time that the Schiele picture 'Portrait of his Wife' listed under 3. belonged to the Jaray collection. Unfortunately, I am unable to examine the accuracy of this statement." (Id. Ex. B at 001747.) This alone should have been sufficient cause for the Belvedere to suspect that Wally was not part of the Rieger collection, even setting all other Government contentions aside and assuming that, as the Museum argues, Bondi never went to the Belvedere and personally laid claim to the Painting. Yet the Museum cites no evidence indicating that the Belvedere conducted any type of follow-up investigation or contacted Bondi, the owner of the Jaray collection.[24]

---

[24] Under Austrian law, a bona fide purchaser for value can acquire title "at a public auction from a tradesman authorized to carry on such trade," regardless of whether the seller actually owned the property in question, but only if the purchaser has a good faith belief that the owner is the seller from the time the contract governing the transfer is completed to the time of the actual property transfer. (Konwitschka Decl. ¶¶ 17-18, 22.) The Museum does not argue that this provision applies to the exchange between the Rieger heirs and the Belvedere, presumably because they did not acquire Wally at a public auction, the Rieger heirs were not "authorized

(cont'd on next page)

Furthermore, Dr. Leopold's own 2008 declaration, submitted by the Museum in support of its motion, makes it unnecessary to further scrutinize the labyrinthine arguments regarding the Belvedere's confidence in its purported ownership of Wally. The Museum concedes, by virtue of the declaration of its Austrian law expert, that when he met Bondi in London, Dr. Leopold "encountered a suspicious fact" sufficient to cause him to doubt the Belvedere's ownership of Wally. (Konwitschka Decl. ¶¶ 26-27.) Dr. Leopold asserts that this meeting took place "[i]n the Summer of 1953." (RL Decl. ¶ 9.) He further declares that he told the Belvedere's Garzarolli of Bondi's claims "in late Summer or Fall of 1953." (Id. ¶ 17.) It is undisputed that the Belvedere obtained Wally from the Rieger heirs after the parties agreed to a contract of sale for eleven works, including "Portrait of a Woman," dated December 27, 1950. (Joint 56.1 Stmt. ¶ 77.) Thus, even assuming that the Belvedere had a good faith belief in its ownership of Wally when it first acquired the Painting from the Rieger heirs, it encountered a suspicious fact triggering a need for further investigation when Dr.

_____

(cont'd from previous page)

tradesm[e]n," and, as already discussed, the Belvedere had reason to believe the Riegers did not own Wally at the time of the initial exchange.

Leopold informed Garzarolli of Bondi's claim. As this occurred in "Summer or Fall" of 1953, and the shortest potentially applicable statutory prescription period is three years (Konwitschka Decl. ¶¶ 54-57), the Belvedere did not possess Wally long enough to acquire the Painting by prescription before it encountered a suspicious fact.

### bb. Dr. Leopold Did Not Acquire Title

The Museum's contention that Dr. Leopold acquired Wally either as a bona fide purchaser or by prescription ultimately fails because he too had reason to doubt the Belvedere's ownership and never performed an investigation sufficient to assuage that doubt.[25] Under Austrian law, even slight negligence by an acquirer (through either bona fide purchase or prescription) destroys the confidence necessary to gain title. (Lambert Resp. Decl. ¶ 7.) Negligence is "the non-observance of the care and diligence usually required in the relevant circumstances." (Id. ¶ 8.)

---

[25] To the extent the Museum contends that the equitable defense of laches operated to invest Dr. Leopold with title to Wally, the proposition is defective as a matter of law. Laches is a defense, not a means by which title is positively established. See Halcon Int'l, Inc. v. Monsanto Australia Ltd., 446 F.2d 156, 159 (7th Cir. 1971) ("The doctrine of laches . . . is a shield of equitable defense rather than a sword for the investiture or divestiture of legal title or right."); see also A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd., No. 88 Civ. 4500 (MJL), 1989 WL 115941, at *2 (S.D.N.Y. Sept. 27, 1989)(same).

Should a purchaser have reason to suspect the seller's ownership, he is required either to return the item in question to its true owner or to conduct a reasonable investigation sufficient to "credibly remove" any ownership doubts. (Konwitschka Decl. ¶ 24; Lambert Resp. Decl. ¶ 9.) In assessing the adequacy of this investigation, Austrian courts take into account any special knowledge pertinent to the context of the exchange; for example, "the Austrian Supreme Court has required business people to use the special knowledge that is generally available to other business people." (Lambert Resp. Decl. ¶ 8; see also Third Konwitschka Decl. ¶ 29(2) ("'The scope of diligence is determined according to the common practice and the concrete suspicious fact. '") (quoting Austrian Supreme Court, Judgment dated May 15, 2001, Index No. 5 Ob 324/00h)).) However, this "duty to make inquiries is limited to a reasonable expenditure of time and efforts." (Third Konwitschka Decl. ¶ 29(1) (quoting Austrian Supreme Court, Judgment dated November 23, 1993, Index No. 5 Ob 563/93). )

As discussed supra in Part II(B)(ii)(3)(c)(aa), the Museum concedes in its proffered expert testimony that Leopold's meeting with Bondi in London constituted an objective reason to doubt the Belvedere's ownership of

Wally that could not be dispelled without adequate investigation.[26] (Konwitschka Decl. ¶¶ 26-27 ("Dr. Leopold encountered a suspicious fact . . . in the meeting with Bondi in her gallery in London in 1953 when Bondi told him that she had a claim to the Painting . . . . Dr. Leopold therefore was obliged to do additional investigation.") (emphasis added).) Relying almost exclusively on Dr. Leopold's 2008 Declaration, the Museum now argues that he made sufficient inquiries into Bondi's claim.[27]

_____

[26] Aside from this concession, the Government offers several additional facts that should have made Dr. Leopold doubt the Belvedere owned Wally: he knew (1) Bondi was listed as Wally's owner in the 1930 Kallir catalogue (LM 56.1 Stmt. ¶ 37), (2) she was an Austrian Jew who had fled the country because of Nazi occupation (Joint 56.1 Stmt. ¶ 83), and (3) her gallery had been restituted to her after the war (id.).

I also note that, because Bondi's meeting with Dr. Leopold in London undoubtedly raised a duty to investigate before Dr. Leopold could acquire good title to Wally, the presumption of good faith under Austrian law is immaterial. Briefly, Austrian law presumes the good faith of a possessor, and a claimant must show evidence indicating a "high probability" of bad faith to destroy the possessor's confidence in good title. (Konwitschka Decl. ¶ 23; Lambert Resp. Decl. ¶¶ 10, 12.) However, if it is shown that the possessor encountered a suspicious fact, which Dr. Leopold's meeting with Bondi indisputably raised, good faith has been lost and can be restored only if reason for suspicion is "credibly removed" by "adequate research." (Konwitschka Decl. ¶ 24.)

[27] The Government objects to consideration of the 2008 Leopold Declaration on the basis that he has already given deposition testimony and his declaration is inadmissible for purposes other than impeachment if he does not testify at trial. (Joint Opp. Mem. 24 n.15.) The Museum correctly

(cont'd on next page)

According to Dr. Leopold's declaration, Bondi told him in 1953 that "she had a claim to the picture" and asked for his help regaining it. (RL Decl. ¶ 12.) She did not tell him, nor did he inquire, how she had lost Wally. (Id. ¶ 13.) Dr. Leopold informed Garzarolli of Bondi's claim in late summer or fall of 1953. (Id. ¶ 17.) At that time, Garzarolli told him that he had never heard of Bondi's ownership claim and the lawyers for the Rieger heirs had assured him that Wally was part of the Rieger collection. (Id.) Dr. Leopold thus "concluded that Mrs. Jaray had sold the picture to Dr. Rieger" because his heirs sold it to the Belvedere. (Id. ¶ 18.)

That winter, Bondi told him she was coming to Vienna, and, at her behest, Dr. Leopold arranged a meeting between Bondi and Garzarolli. (Id. ¶ 19.) Bondi agreed to call him after she met Garzarolli but never did so. (Id. ¶ 21.) A month later, Dr. Leopold spoke with Garzarolli, who said he had twice met with Bondi but she never spoke of her claim to Wally. (Id. ¶ 22.) Garzarolli further remarked "You

_____

(cont'd from previous page)
observes that the Government submits no evidentiary support for the assertion that Dr. Leopold will not be available to testify at trial. (LM Reply 2.) Accordingly, absent directly contradictory deposition testimony, I decline the Government's invitation to "disregard the new [declaration]," although I recognize that the Government disputes the veracity of its contents.

see? It cannot be true what Mrs. Jaray had told you about her alleged ownership rights to the picture.  The picture belonged to the heirs of Dr. Rieger." (Id.)  Finally, Leopold states that he again met Bondi in London in June of 1954. (Id. ¶ 23.)  He asked why she had not called him and why she did not tell Garzarolli of her claim to Wally. (Id.)  Bondi responded: "Let's drop it.  I do not want to talk about it any more."[28]  (Id.)

The Museum, casting Leopold as a 28 year-old medical student and a neophyte to the art world, argues that Dr. Leopold thus resolved any doubt that the Rieger heirs, and the Belvedere, owned Wally.  I disagree.  As a threshold matter, I note that Dr. Leopold was an experienced art buyer by the time he met Bondi.  He had begun acquiring works by Schiele three years earlier (id. ¶¶ 6-7); he went to London to acquire yet another Schiele painting from a different art dealer (id. ¶ 9); and he had studied the 1930 Kallir catalogue listing Bondi as Wally's most recent owner

---

[28] The Government disputes that any such meeting ever took place, arguing that if it had, Bondi's correspondence would have mentioned the meeting and Dr. Leopold would have related it in his October 1957 letter responding to Hunna's inquiry as to why he acquired Wally for himself when he had promised to help Bondi recover it. (Joint Counter 56.1 Stmt. ¶ 45.)  Such arguments go to credibility, and the Government has not shown any directly contradictory evidence.  I will therefore assume for the purposes of the instant motions that the meeting took place as Dr. Leopold describes.

see? It cannot be true what Mrs. Jaray had told you about her alleged ownership rights to the picture. The picture belonged to the heirs of Dr. Rieger." (Id.) Finally, Leopold states that he again met Bondi in London in June of 1954. (Id. ¶ 23.) He asked why she had not called him and why she did not tell Garzarolli of her claim to Wally. (Id.) Bondi responded: "Let's drop it. I do not want to talk about it any more."[28] (Id.)

The Museum, casting Leopold as a 28 year-old medical student and a neophyte to the art world, argues that Dr. Leopold thus resolved any doubt that the Rieger heirs, and the Belvedere, owned Wally. I disagree. As a threshold matter, I note that Dr. Leopold was an experienced art buyer by the time he met Bondi. He had begun acquiring works by Schiele three years earlier (id. ¶¶ 6-7); he went to London to acquire yet another Schiele painting from a different art dealer (id. ¶ 9); and he had studied the 1930 Kallir catalogue listing Bondi as Wally's most recent owner

---

[28] The Government disputes that any such meeting ever took place, arguing that if it had, Bondi's correspondence would have mentioned the meeting and Dr. Leopold would have related it in his October 1957 letter responding to Hunna's inquiry as to why he acquired Wally for himself when he had promised to help Bondi recover it. (Joint Counter 56.1 Stmt. ¶ 45.) Such arguments go to credibility, and the Government has not shown any directly contradictory evidence. I will therefore assume for the purposes of the instant motions that the meeting took place as Dr. Leopold describes.

(LM 56.1 Stmt. ¶ 37). Dr. Leopold also knew Bondi was Jewish and cannot have been ignorant of the indisputable fact that Nazi persecution gave reason to suspect the provenance of artworks that had formerly belonged to Jews. (See Lambert Resp. Decl. ¶ 20.)

I need not hold that, under Austrian law, Dr. Leopold's knowledge of Bondi's claim required him to do extensive provenance research in order to find his cursory investigation inadequate to dispel any ownership doubts. Dr. Leopold's declaration makes readily apparent that soon after Bondi told him she owned Wally, he "concluded that Mrs. Jaray had sold the picture to Dr. Rieger" on the word of Garzarolli alone. (See RL Decl. ¶ 23.) Notably, he sought no documentation whatsoever regarding Wally's provenance, even though the last catalogue addressing the issue listed Bondi as its owner.[29] Nor did he contact either the Rieger heirs or their lawyers. He did not even

---

[29] The Museum's expert observes that Dr. Leopold may not have been able to obtain a copy of the Restitution Commission's decision regarding the Riegers claim – which might have put him on notice that Wally was not specifically referenced therein – because "[i]t is impossible to find a restitution decision if one does not know the commission and the file number, and it was not possible to get access to that decision without being a party to the proceedings or a representative of such party." (Third Konwitschka Decl. ¶ 25.) However, Dr. Leopold knew that Garzarolli was in touch with representatives of the Rieger heirs and could at least have asked for such documentation.

ask Bondi why she thought the Painting was hers or how she had lost it to begin with. Rather, he simply asked the party from whom he hoped to acquire Wally to deal with the issue and looked no further.[30] Dr. Leopold cannot be said to have reasonably dispelled any ownership doubts by relying solely on the seller's uncorroborated word.

The Museum's strongest argument is that Bondi herself told Dr. Leopold to "drop the matter" when they met for the second time in London in June of 1954. Even under the facts as presented by Dr. Leopold, however, Bondi did not rescind her claim to Wally. She simply said she did not

---

[30] In this regard, I note that the Belvedere Museum had a substantial interest in facilitating the exchange of "Rainerbub" for Wally because it deemed the former to be much more valuable. The minutes of the Belvedere's July 12, 1954 Exchange Commission meeting (which Garzarolli attended) note that:

> [Rainerbub] by EGON SCHIELE is one of his best early works, from the year 1910, and in the opinion of the undersigned is to be valued at S 8,000.—(eight thousand Schillings). Since the [Belvedere] purchased the painting "Vally from Krumau" for S 3000, the purchase is decidedly commercially advantageous, even if the idea of the greater importance of [Rainerbub] did not influence the [Belvedere].

(RL Decl. Ex. F at LM 1795.) The Museum further asserts, and the Government disputes, that Dr. Leopold knew that "Rainerbub" was more valuable than Wally. (Joint Counter 56.1 Stmt. ¶ 52.) Thus, accepting the Museum's assertion as true, Dr. Leopold had all the more reason to suspect that Garzarolli's affirmation of ownership was motivated by self-interest.

want to talk about it. Furthermore, although Bondi did not know it, Dr. Leopold clearly contemplated acquiring Wally for himself at that time. Even before this alleged second meeting with Bondi, he had begun discussing a possible exchange with the Belvedere, and Garzarolli specifically, that same month. (RL Decl. ¶ 25.) Nevertheless, Dr. Leopold never told Bondi of his intentions nor did he ask why she thought Wally belonged to her. Bondi might well have reacted differently had she known what Dr. Leopold was thinking.[31] In short, had he been truly interested in resolving any doubts as to Wally's ownership, Dr. Leopold would have disclosed this information and asked Bondi for the basis of her claim. His failure to do so was plainly negligent and serves to vitiate any claim to good-faith acquisition he might otherwise have had.

I conclude that, as a matter of law, Dr. Leopold cannot have acquired good title to Wally either as a bona fide purchaser or by prescription. He was not a bona fide purchaser because he had objective reason to doubt the Belvedere's ownership before he acquired Wally, and his

---

[31] Indeed, when she discovered that Dr. Leopold had gotten Wally from the Belvedere, Bondi asked Hunna to retrieve it from him. (3/10/08 Levin Decl. Ex. 12 at JK 000053-54.)

minimal efforts did not dispel that doubt.[32]  Nor, with

respect to acquisition by prescription, did he perform an

adequate investigation after he acquired Wally.  The

Museum's argument that Dr. Leopold became confident in his

ownership after exchanging letters with Hunna in 1957 makes

little sense. (Konwitschka Decl. ¶ 60.)  Hunna claimed that

Bondi owned Wally. (RL Decl. Ex. N at LM 3832-33.)  Dr.

Leopold responded by describing why he had gotten the

Painting and that Garzarolli had assured him it belonged to

the Rieger heirs; he made no mention of any 1954 meeting

with Bondi.[33] (Id. Ex. O at LM 1255-56.)  When Hunna

---

[32] Accordingly, I need not reach the parties' remaining
arguments concerning Article 367 of the Austrian Civil
Code.

[33] In his 2008 Declaration, Dr. Leopold asserts that he
called Mueller, one of the Rieger heirs' lawyers, to
confirm Wally had indeed belonged to the Rieger heirs
before responding to Hunna. (RL Decl. ¶ 51.)  As the
Government observes, this assertion is belied by Dr.
Leopold's failure to mention this call in his detailed
letter to Hunna defending his acquisition of Wally and the
fact that he made no such inquiry when he acquired Wally in
the first place. (Joint Counter 56.1 Stmt. ¶ 58.)

    However, assuming, as I must for purposes of the
Government's motion, that he indeed called Mueller, Dr.
Leopold's investigation remained inadequate.  Even after
being contacted by Bondi's attorney and faced with the
immediate threat of litigation, Dr. Leopold admittedly
sought no documentation whatsoever regarding Wally's
provenance, never contacted the Rieger heirs (who, as
evidenced by the Rieger declaration described in footnote
22, supra, have stated that Wally was never part of the
Rieger collection), or asked either Bondi or Hunna for any

(cont'd on next page)

responded that Bondi still asserted her ownership right and
the Rieger heirs had obtained Wally by mistake, Dr. Leopold
had Garzarolli respond. (Id. Ex. P at 3830-31; Ex. Q at LM
3829.)  That Hunna did not send Dr. Leopold further
correspondence on the matter does not mean that the doubts
raised were laid to rest.  Dr. Leopold knew that Bondi
still asserted a claim and refused to give her the
Painting.  The Museum cites no authority indicating that a
possessor thus aware of an adverse ownership claim
nonetheless holds the property at issue in good faith
unless the adverse party then sues for it.  Objective
doubts must be resolved by adequate investigation, and Dr.
Leopold admittedly investigated the matter no further.[34]

---

(cont'd from previous page)

details regarding how Bondi parted with Wally.  These
investigative deficiencies are all the more glaring insofar
as Dr. Leopold knew that Bondi had indeed owned Wally
before the war and had even once agreed to facilitate her
retrieval of the Painting.  Furthermore, I note that, like
Garzarolli, Mueller had an interest in asserting the
validity of the sale of Wally to the Belvedere, in which he
had a hand.

[34] As noted below, this finding is not predicated on any
conclusion as to Dr. Leopold's state of mind with regard to
Wally.  Even if he called both Garzarolli and Mueller in a
good faith attempt to resolve his doubts as to the
Painting's true owner, Dr. Leopold's investigation of
Wally's ownership was negligent at best. (See Lambert Resp.
Decl. ¶ 7.)

#### 4. Scienter

The Government has thus far shown probable cause to believe that Wally was stolen and remained so until it arrived in this country, whereas the Museum has not met its burden of showing otherwise. However, this is not alone sufficient to render the Painting subject to forfeiture under the pre-CAFRA NSPA. The Government must also show that the Museum imported Wally into the United States knowing it was either stolen or converted. To this end, the Government contends that Dr. Leopold either knew Wally was stolen or himself converted it and that his knowledge should be attributed to the Museum under agency principles. I conclude that the trier of fact must determine whether Dr. Leopold knew the Painting was either stolen or converted. Should the jury find that he did, his knowledge will be imputed to the Museum.

### a. Whether Dr. Leopold knew *Wally* was stolen

My conclusion that, under Austrian law, Dr. Leopold did not perform an adequate investigation to obviate reasonable suspicion that Wally belonged to Bondi does not compel a finding that he knew someone stole it from her. It is possible that, while Dr. Leopold's efforts to remove

90

a reasonable doubt that he had title to the Painting were legally insufficient to support acquisition by prescription under Austrian law, they were made in good faith. Indeed, as the Museum observes, the Government has offered no evidence indicating that Bondi ever told Dr. Leopold how she lost Wally.

On the other hand, Dr. Leopold need not have been expressly told that Wally was stolen to have known it was. The Painting is also subject to forfeiture if Dr. Leopold was aware of a high probability that Wally was stolen and deliberately looked the other way. See, e.g., United States v. Reyes, 302 F.3d 48, 54 (2d Cir. 2002) ("[D]eliberate ignorance and positive knowledge are equally culpable . . . . [t]o act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question. When such awareness is present, 'positive' knowledge is not required.") (quoting United States v. Jewell, 532 F.2d 697, 700 (9th Cir. 1976) (en banc))). The Government may rely on circumstantial evidence to show that Dr. Leopold had the requisite knowledge to render Wally forfeit. See United States v. Spencer, 439 F.2d 1047, 1049 (2d Cir. 1971).

91

aa.   The Government's Evidence

The Government has produced sufficient evidence to
support a finding of probable cause to believe Dr. Leopold
knew Wally was stolen or deliberately avoided learning that
fact.   To this end, in addition to emphasizing the
inadequacy of Dr. Leopold's investigation of Bondi's
ownership claim, the Government relies on the haste with
which Dr. Leopold acquired Wally, Hunna and Bondi's
correspondence, and Dr. Leopold's subsequent publications
of the Painting's provenance.   First, the Government
observes that the Austrian Ministry of Education's approval
of the Belvedere's exchange of Wally for "Rainerbub" was
expedited "due to the subsequent threat of one picture
owner to withdraw his offer if the exchange were further
delayed." (3/10/08 Levin Decl. Ex. 11 at LM 1816; RL Decl.
Ex. F at LM 1795.)   The Government contends that Dr.
Leopold was the referenced "picture owner" and that his
rush to conclude the exchange evidences his awareness that
he doubted whether the Rieger heirs, and thus the
Belvedere, really owned Wally.[35] (Joint Opp. Mem. 25.)

---

[35]  Although the underlying documents clarify that the
reference is to the exchange of Wally for "Rainerbub," the
Museum denies that the quoted language is a reference to
Dr. Leopold.   (LM Counter 56.1 Stmt. ¶ 97).   It does not,
however, assert that the Belvedere hurried to complete the
(cont'd on next page)

The Government next argues that various correspondence demonstrates Dr. Leopold's guilty knowledge.  Hunna's two letters to Dr. Leopold in 1957 reminded him of Bondi's ownership claim, yet he made no further inquiries on the subject.[36]  Furthermore, in her October 3, 1957 letter to Hunna, Bondi asserts that after discovering Dr. Leopold had acquired Wally, she encountered him at an exhibition "and asked him at once whether he had brought my picture along with him.  He was very self-conscious and said that must be settled in some way, but unfortunately he was called away immediately . . . ." (3/10/08 Levin Decl. Ex. 12 at JK 000053-54.)

The Government also cites Dr. Leopold's own publications as evidence that he knew, or deliberately avoided knowing, that Wally was stolen.  It argues that Dr. Leopold's 1972 book on Schiele is fundamentally inconsistent with his assertion that he believed the Riegers ever owned Wally for two reasons.  First, the book contains an essay on Rieger that contains the following

(cont'd from previous page)

transaction.  Nor does the Museum explain why the Belvedere would threaten to terminate an exchange which the Belvedere viewed as "decidedly commercially advantageous." (RL Decl. Ex. F at LM 1795.).

[36] As noted in footnote 33, supra, the Government disputes that Dr. Leopold ever called Mueller to verify that Wally belonged to the Rieger heirs.

language (translated from German): "In addition to two paintings ["Cardinal and Nun" and "Lovers"], Dr. Rieger later owned a substantial collection of Schiele's drawings and watercolors, which was exhibited at the 'Neue Galerie' in 1928." (RL Opp. Decl. Ex. A at 669.) The Government contends that had he believed Dr. Rieger owned Wally, he would have said so here. (Joint Reply Mem. 29.)[37] Second, it seizes on the following language in the introduction to the 1972 book's catalogue raisonné: "[s]equences of ownership . . . were included only if the information in [the 1966 Kallir Catalogue] had to be corrected or substantially supplemented." (5/14/09 Levin Decl. Ex. 4 at LB000255.) The 1966 Kallir catalogue gave the following provenance for Wally: Emil Toepfer, Vienna; Richard Lanyi, Vienna; Lea Bondi, Vienna; Dr. Rudolf Leopold, Vienna. (Joint 56.1 Stmt. ¶ 118.) Dr. Leopold's book lists only Emil Toepfer and himself. (Id. ¶ 123.) Thus, the Government asserts, Dr. Leopold's failure to include Dr. Rieger, his heirs, or the Belvedere, despite the fact that their purported ownership had not been reported in the 1966

---

[37] As further explored below, Dr. Leopold expressly denies that this sentence was meant to be a complete list of Dr. Rieger's Schiele paintings: "The paragraph at issue merely asserts that in addition to two Schiele paintings owned by Dr. Rieger, a collection of his Schiele drawings and water colors was exhibited in 1928 at the Neue Galerie in Vienna." (RL Opp. Decl. ¶ 2.)

Kallir catalogue, shows that he knew they never owned Wally.

Finally, the Government argues that Dr. Leopold's 1995 revision of Wally's provenance evidences an overt attempt to legitimate his ownership through sheer fabrication. Here, for the first time, Dr. Leopold listed Dr. Rieger, Heinrich Rieger, Jr. and the Belvedere as prior owners of Wally. (Id. ¶ 130.) Because he had not previously done so, the Government thus infers that Dr. Leopold knew Wally never belonged to the Rieger heirs but wanted to forestall any uncomfortable questions about the Museum's title to the Painting.

This showing is sufficient to establish probable cause to believe that Dr. Leopold knew, or consciously avoided knowing, that Wally was stolen. He admittedly knew that Bondi claimed the painting but never asked her how she lost it. He also knew that she owned Wally before World War II and that she had fled Austria once the Nazis took over. Dr. Leopold purportedly relied solely on Garzarolli's word that the Riegers had owned the Painting when he acquired it from the Belvedere, and he never sought any sort of documentary confirmation or attempted to contact the Rieger heirs or question Bondi himself. This, added to the evidence indicating he rushed the exchange whereby he

acquired Wally and, despite authoring one of the definitive
books on Schiele, made no mention of the Riegers' supposed
ownership of the Painting until 1995, provides reasonable
grounds to believe he effectively knew that Wally was
stolen.

> ### bb. The Museum's Evidence Raises a Genuine Factual Dispute as to Whether It Has Met Its Evidentiary Burden

For its part, the Museum offers multiple reasons to
doubt that Dr. Leopold knew, or avoided knowing, the
Painting was stolen: (1) he investigated Bondi's claim, (2)
he made no attempt to hide his acquisition of Wally, and
(3) his publications were not intentionally misleading.
Making all reasonable inferences in the Museum's favor, as
I must when assessing whether to grant the Government's
summary judgment motion, these arguments and the evidence
supporting them raise a triable issue of fact as to whether
the Museum has shown by a preponderance of the evidence
that Dr. Leopold lacked the requisite scienter to render
Wally forfeit.

First, the Museum reiterates the arguments it made in
support of Dr. Leopold's claim to good faith ownership
under Austrian law, namely that after his 1953 encounter

with Bondi (during which time she never told him that Welz
had stolen Wally), Dr. Leopold arranged for Bondi to meet
with Garzarolli to claim Wally from the Belvedere but she
declined to do so (RL Decl. ¶ 22); he confirmed with
Garzarolli that Wally belonged to the Rieger heirs before
the Belvedere acquired it (id. ¶ 17); and when he asked
Bondi about the Painting in 1954 she asked him to "drop it"
(id. ¶ 23).  Dr. Garzarolli's December 3, 1957 letter to
Hunna corroborates this account insofar as it asserts that
Bondi twice visited the Belvedere without mentioning any
claim to Wally and that the Painting had been restituted to
the Rieger heirs. (RL Decl. Ex. Q at LM 3829.)  Dr. Leopold
also asserts that Mueller told him Wally had belonged to
the Rieger collection. (RL Decl. ¶ 51.)

      That I have already rejected these arguments when
applied to the question of whether Dr. Leopold restored the
requisite level of confidence in his ownership to acquire
the Painting by prescription does not mean they have no
bearing here.  Even if Dr. Leopold's investigation of the
suspicious fact he undoubtedly encountered when Bondi told
him Wally was hers had been performed in good faith, it was
too perfunctory to serve as a basis for his acquisition of
title to the Painting under Austrian law.  However, if this
were the case, and Dr. Leopold merely acted negligently, he

may have lacked the scienter necessary to render Wally forfeit.

Additionally, the Museum observes that Dr. Leopold did not try to hide his acquisition of Wally. To the contrary, he publicly exhibited the Painting on multiple occasions and in various countries besides Austria, including Japan, Switzerland, and London, before it became part of the Museum's collection. (LM 56.1 Stmt. ¶ 65.) Indeed, according to Hunna's letter, Bondi discovered Leopold had acquired Wally at just such an exhibition. (See RL Decl. Ex. N at LM 3832). The Museum further argues that the silence of Bondi and her heirs between 1958 and the initiation of this lawsuit long ago laid to rest any fears Dr. Leopold may have had that Wally was stolen. (LM Mem. 42-46.)

The Museum also offers evidence to counter the Government's spin on Dr. Leopold's publications. With regard to Dr. Leopold's 1972 book, it cites yet another Declaration by Dr. Leopold indicating that he never intended to imply that the only two paintings owned by Dr. Rieger were Cardinal and Nun and Lovers. (RL Opp. Decl. ¶¶ 2-3.) To support this statement, Dr. Leopold observes that his 1972 book lists Dr. Rieger in the provenance of other Schiele paintings, a point to which the Government

98

has not responded. (Id. ¶ 3.) The Museum also submits that

Dr. Leopold's failure to list the Rieger heirs in Wally's

provenance at this time was not due to any suspicion that

they had not owned the Painting but rather conformed with

the book's stated practice of listing only a paintings

first or very early owner followed by its most recent

owner. (See 5/14/09 Levin Decl. Ex. 4 at LB000255; LM

Counter 56.1 Stmt. ¶ 125.) Because the 1966 Kallir

Catalogue already listed Emil Toepfer and Dr. Leopold, no

revision was necessary.[38] (See LM Opp. Mem. 29 n.38.)

With respect to the 1995 provenance, the Museum

underscores the fact that Dr. Leopold's assistant, rather

than Dr. Leopold, suggested expanding Wally's provenance to

include interim owners between Toepfer and Dr. Leopold.

---

[38] In its response to the Government's Rule 56.1 statement,
the Museum further asserts that it was not common practice
among art historians at this time to list all interim
possessors of a painting, citing a May 9, 1965 letter from
Otto Kallir to Bondi. (LM Counter 56.1 Stmt. ¶ 125.) This
citation is somewhat odd, as the referenced letter clearly
shows that Kallir was contemplating inserting all interim
possessors into Wally's provenance. (Barron Decl. Ex. D at
JK 000059.)

More compelling is the Museum's observation during
oral argument that even though Dr. Leopold acquired
"Cardinal and Nun" from the Belvedere in 1957 (LM 56.1
Stmt. ¶ 55) and the Belvedere had acquired this painting in
the same transaction in which it gained possession of
Wally, Leopold's 1972 book lists only the first and last
owners in its catalogue (Dr. Heinrich Rieger and Dr
Leopold) and makes no mention of the Belvedere. (O/A Tr.
66:5-67:8.)

Thus, the Museum argues, Dr. Leopold was not looking to falsify Wally's history, but rather added information he sincerely believed to be true. (See RL Opp. Decl. ¶ 9 ("I had no doubt that Dr. Heinrich Rieger, the Rieger Estate, and the Belvedere were the owners of the Painting.").)

### cc. Trial is warranted

Both the Government and the Museum have thus offered conflicting evidence to support their respective positions on Dr. Leopold's knowledge with respect to Wally. If, as the Museum contends, Dr. Leopold actually believed that the Painting was not stolen, he cannot be said to have consciously avoided that fact. United States v. Schultz, 333 F.3d 393, 413 (2d Cir. 2003). If, on the other hand, he purposely rushed his acquisition of Wally because he knew it belonged to Bondi and sought to conceal this fact in his later publications, Dr. Leopold undoubtedly had the requisite knowledge to render Wally forfeit. I cannot say that, making all reasonable inferences in favor of the non-moving party with respect to each motion, there is only one choice for a reasonable trier of fact on this issue. Accordingly, the question is properly one for the jury. As I have already found that the Government has met its threshold burden of showing probable cause to believe Dr.

Leopold knew <u>Wally</u> was stolen, the Museum will bear the burden of proving at trial that he did not. <u>See United States v. Collado</u>, 348 F.3d 323, 327 (2d Cir. 2003).

### b. Whether Dr. Leopold Converted *Wally*

The Government's contention that Dr. Leopold criminally converted <u>Wally</u> presents a similar question for the trier of fact. Criminal conversion under the NSPA is "the '[u]nauthorized and wrongful exercise of dominion and control over another's personal property, to exclusion of or inconsistent with [the] rights of [the] owner.'" <u>Wally III</u>, 2002 WL 553532, at *24 (quoting <u>United States v. Smith</u>, 686 F.2d 234, 242 (5th Cir. 1982)). However, to have criminally converted <u>Wally</u>, Dr. Leopold cannot merely have been negligent in acquiring it.[39] <u>See United States v. Bright</u>, 517 F.2d 584, 587 (2d Cir. 1975) ("A negligent or a foolish person is not a criminal when criminal intent is an ingredient."). He must have had the requisite <u>mens rea</u>, i.e., he must have known that his possession was wrongful. <u>See id.</u> (stating that in cases involving receipt of stolen

---

[39] Therefore, one may lack the good-faith confidence in ownership required to gain title by prescription under Austrian law, according to which negligence in the acquisition of a good will negate the ordinary presumption of good-faith ownership, without having criminally converted that good under the NSPA.

goods, knowledge required to prove guilt "should always embrace the ultimate concept of mens rea"); see also Wally III, 2002 WL 553532, at *24 (stating that Dr. Leopold must have intended to convert Wally.) The Government has established probable cause to believe Dr. Leopold knew he wrongfully acquired Wally by virtue of the undisputed fact that he knew Bondi claimed to own the Painting. However, as discussed above with respect to whether Dr. Leopold knew Wally was stolen, the Museum's arguments that he attempted to investigate Bondi's claims, believed in Garzarolli and Mueller's assurances that the Belvedere had lawfully acquired Wally from the Rieger heirs, and made no effort to hide his acquisition of the Painting are sufficient to raise a triable issue of fact as to whether Dr. Leopold had the requisite intent to effect a criminal conversion. At trial, the Museum will bear the burden of proving that he did not.

> c.  Dr. Leopold's Knowledge may be imputed
>     to the Museum.

In Wally III, Judge Mukasey held that Dr. Leopold's knowledge as to Wally's status is properly imputed to the Museum. 2002 WL 553532, at *24 ("All parties concede that Dr. Leopold's knowledge can be imputed to the Leopold Foundation by reason of his having been the Museological

Director at all relevant times."). His conclusion was
well-founded, as the Government repeatedly argued that the
Museum knew what Dr. Leopold knew, and the Museum offered
no rebuttal. (See Government's Memorandum of Law in
Opposition to Motions to Dismiss the Third Amended Verified
Complaint of the Leopold Museum-Privatstiftung and the
Museum of Modern Art as Claimants and the American
Association of Museums, et al. as Amici Curiae 29 ("[t]he
Leopold, through its Museological Director, Dr. Leopold,
imported the painting with knowledge that it was stolen
property."); 124 ("[t]he Complaint contains ample
allegations . . . that the Leopold, through it [sic]
Museological Director, Dr. Leopold, had the requisite
knowledge that Wally had been obtained by conversion.");
124 ("[t]he Leopold, through Dr. Leopold, knew Wally to be
stolen and converted property at the time it was imported
into the United States."); 125 ("[t]he Leopold, through Dr.
Leopold, imported Wally with knowledge that it was stolen
from Bondi.").) Now, more than six years later, the Museum
belatedly contests Judge Mukasey's finding, arguing for the
first time that imputing Dr. Leopold's knowledge to the
Museum is improper.

　　　This argument is barred by the law of the case,
according to which courts generally "refuse to reopen what

103

has been decided." Christianson v. Colt Indus. Operating
Corp., 486 U.S. 800, 817 (1988) (quoting Messinger v.
Anderson, 225 U.S. 436, 444 (1912)). The Supreme Court has
cautioned that although a court has power to revisit such
an issue, it "should be loathe to do so in the absence of
extraordinary circumstances such as where the initial
decision was 'clearly erroneous and would work a manifest
injustice.'" Id. (quoting Arizona v. California, 460 U.S.
605, 618 n.8 (1983)). This is particularly true in a case,
such as this, in which the presiding judge has changed. L-3
Commnc'ns Corp. v. OSI Sys., No. 02 Civ. 9144 (PAC), 2007
WL 576124, at *5 (S.D.N.Y. Feb. 23, 2007) ("When . . . the
judges in a case are switched mid-stream, as happened here,
the successor judge may not reconsider his predecessor's
rulings with the same freedom that he may consider his own
rulings."), rev'd in part on other grounds, 283 Fed. Appx.
830 (2d Cir. 2008). Here, the Museum has presented no
"extraordinary circumstances" to justify revising Wally
III. The Museum had ample opportunity to contest the
Government's pervasive charge that it knew what Dr. Leopold
knew before Judge Mukasey's decision. It did not. On this
basis alone, Judge Mukasey was entitled to find the Museum
had conceded the point. The Museum was then free to

request reconsideration.  Again, it did not.  I will not
now revisit the matter.

### 5.  Laches

The Museum argues that, even if Wally would otherwise
be subject to forfeiture, the Court should apply the
equitable doctrine of laches to bar this action.  The Court
has discretion to apply the doctrine in light of "the
'equities of the parties.'"  Robins Island Pres. Fund, Inc.
v. Southold Dev. Corp., 959 F.2d 409, 423 (2d Cir. 1992)
(quoting Gardner v. Panama R.R. Co., 342 U.S. 29, 30-31
(1951)).  "Generally, laches is applied where it is clear
that a plaintiff unreasonably delayed in initiating an
action and a defendant was unfairly prejudiced by the
delay."  Id. (citing Stone v. Williams, 873 F.2d 620, 623
(2d Cir. 1989), vacated on other grounds, 891 F.2d 401 (2d
Cir. 1989)).  Here, the Museum observes that neither Bondi
nor any of her heirs sought to retrieve Wally in the forty-
year period between Hunna's last letter to Dr. Leopold and
Wally's importation to New York.  The Museum argues that

its ability to defend against forfeiture has been substantially prejudiced by this delay because many witnesses to the events at issue in this action are long dead:  Hunna died in 1964; Garzarolli died in 1964; Bondi died in 1969; Otto Kallir died in 1978; Welz died in 1980; Novotny died in 1983; Broda died in 1987; and Kremlacek died in 1990 (LM Mem. 26, 28, 30-31.)  It also points to numerous letters from Bondi indicating that although she knew where Wally was, she consciously chose not to sue for it because, as she wrote in a May 16, 1965 letter to Kallir, "if the litigation was lost, the picture would irrevocably be taken from my possession."[41] (Barron Decl. Ex. D at JK 00058; LM 56.1 Stmt. ¶ 87.)

The Museum has not, however, provided any legal basis for asserting a laches defense against the Government.  It offers no authority indicating that laches even applies to a civil forfeiture action brought by the United States, and for good reason, as Supreme Court precedent makes this a dubious proposition. See United States v. Summerlin, 310 U.S. 414, 416 (1940) ("It is well settled that the United

---

[41] The Government interprets the same correspondence to mean that "Bondi never filed a lawsuit for Wally because the post-war climate in Austria in which Jews had great difficulty recovering their property led Bondi to conclude that any legal proceeding in Austria would fail." (Joint Counter 56.1 Stmt. ¶ 87.)

States is not . . . subject to the defense of laches in enforcing its rights."). Indeed, the Museum acknowledged at oral argument that the Government is "immune" from the laches defense. (O/A Tr. 27:17-21.) Moreover, even if a laches defense could apply, the Museum does not contest that the United States timely filed suit. Also, to the extent this defense is directed at the Bondi Estate, it is irrelevant insofar as the Museum's motion does not seek to strike the Estate's claim. (See dkt. No. 219.)

The Museum's principal argument, for which it offers no legal authority involving a civil forfeiture action, is that the Government's forfeiture claim depends on the viability of the Estate's claim to Wally and is thus barred by laches if the defense would apply to a similar claim by the Estate. (O/A Tr. 27:10-12.) However, the Estate's claim would be predicated on whether it has title under Austrian law, and Judge Mukasey has already decided that "under [Austrian law], Bondi's ownership claim survives." Wally III, 2002 WL 553532, at *20. Thus, not only was this forfeiture timely asserted under federal law, but a claim by the Estate would be timely under Austrian law as well. Accordingly, the Government's claim may not be barred on the basis of any purportedly undue delay by Bondi or her estate.

### 6. Due Process

Lastly, as it did in Wally III, the Museum argues that application of the NSPA in this case would violate its due process right to "fair notice" that importing Wally was unlawful. In assessing this contention, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." United States v. Lanier, 520 U.S. 259, 267 (1997). The Museum again argues that applying the NSPA to Wally is unconstitutional because Wally was not stolen but rather is subject to a genuine ownership dispute. It further contends that Austrian law is unclear as to Wally's ownership. These arguments are even less persuasive now than they were at the motion-to-dismiss stage. See Wally III, 2002 WL 553532, at *26-27. I have already found that the Government has demonstrated probable cause to believe both that Wally was stolen, not merely subject to an ownership dispute, and remained so under Austrian law until it was seized in this action. The Museum has not shown otherwise. Furthermore, the Museum may yet prevail by proving to the trier of fact that Dr. Leopold did not know, or deliberately avoid discovering, that Wally was stolen or converted.

## III. CONCLUSION

For above the reasons, trial is warranted on the issue of whether Dr. Leopold knew Wally was stolen when the Museum imported it into the United States for exhibition at the MOMA. The parties' summary judgment motions [dkt nos. 219, 257] are hereby DENIED. The parties shall confer and inform the Court by letter no later than October 14, 2009 how they propose to proceed.


SO ORDERED:

Dated:     New York, New York
           September 30, 2009


LORETTA A. PRESKA
Chief U.S.D.J.

109